## RUNYAN *v.* GOODRUM.

### Opinion delivered February 21, 1921.

1. PHYSICIANS AND SURGEONS—LIABILITY FOR NEGLIGENCE OF X-RAY SPECIALIST.—Where defendant surgeons maintained an x-ray department in their hospital, and employed a competent and skilled specialist in that department, over whom they had no control as to the method used in doing x-ray work, the defendants were not liable for the negligence of such specialist.

2. PHYSICIANS AND SURGEONS—DEGREE OF CARE IN USE OF X-RAY MACHINE.—Surgeons maintaining an x-ray department at their hospital are bound to exercise ordinary care to see that this department is equipped with such apparatus as is generally approved by roentgenologists as best adapted for the proper diagnosis and treatment of diseases, and to provide competent specialists to do the work in the department; ordinary care in such case meaning a very high degree of care.

3. EVIDENCE—SUFFICIENCY.—A jury should not be allowed to speculate on probabilities of an instrument being defective in the face of positive testimony that the instrument was not defective or unsafe.

4. PHYSICIANS AND SURGEONS—NEGLIGENCE IN X-RAY EXPOSURE.— The doctrine of *res ipsa loquitur* does not apply to a case of alleged negligence on the part of surgeons by burning a patient in the application of an x-ray machine; it being shown that on account of the idiosyncracies of that machine one person of a certain type and temperament would be susceptible to a burn while another person of a different type under the same circumstances would not be burned, and that burns do occasionally occur in the ordinary course of the exposure, in spite of the highest diligence and skill to prevent them.

5. PHYSICIANS AND SURGEONS—BURDEN OF PROVING NEGLIGENCE.— The burden of proof was on one suing surgeons for burns during x-ray exposure by their operator to show negligence on the part of the operator, and that such negligence was the proximate cause of plaintiff's injury.

6. PHYSICIANS AND SURGEONS—X-RAY BURNS—PROXIMATE CAUSE.—In an action against surgeons for x-ray burns received by plaintiff, evidence *held* to show that the proximate cause of plaintiff's injuries was not a defect in defendants' x-ray machine, but was the negligence of an independent operator of the machine.

Appeal from Lonoke Circuit Court; *George W. Clark,* Judge; reversed.

*Buzbee, Pugh & Harrison,* for appellants.

1.    It is well settled that a physician or surgeon may recommend or employ another physician or surgeon to treat a patient for him or assist him in treating a patient, and in the absence of negligence in such selection he will not be liable for the negligence or lack of skill of the physician or surgeon so recommended or employed by him. 30 L. R. A. 345; 65 Ark. 578; 132 *Id.* 18; L. R. A. 1918 C 132; 199 Fed. 760; 211 S. W. 214; 218 *Id.* 924.

2.    It is also well established that a physician or surgeon may be liable for damages caused by the negligence or default of his employee or servant under his direction.   64 L. R. A. 969; 180 Mo. 322; 87 Ohio St. 401; 45 L. R. A. (N. S.) 640; 46 *Id.* 611; 239 Pa. St. 351.   The liability of appellants is governed by the rule laid down with reference to the employment by a physician or surgeon of another physician or surgeon rather than by the rule established in reference to the employment of a nurse or similar assistant, but the court declined to adopt our theory and hence this appeal, as the court refused to give the instructions requested, which was error.   30 L. R. A. 345; 65 Ark. 578.

Appellants were not liable for the negligence of Miss Green, if any there was.   The relation of master and servant did not exist between appellants and Miss Green, and the doctrine of *respondeat superior* does not apply.   One who employs a person who follows a distinct and independent occupation of his own is not responsible for the neglect or improper acts of the other.   98 Ark. 399; 51 Tex. 510; 211 S. W. 214; 2 Mich. 369.

X-ray work is a distinct and independent occupation and a profession, and appellants were not liable for the negligence of either Doctor McGill or Miss Green and the case should be reversed.

3.    The verdict is outrageously excessive under the evidence, and the argument of counsel for appellee to the

jury was prejudicial. 100 Ark. 526; 78 *Id.* 56; 92 *Id.* 569; 59 *Id.* 105; 58 *Id.* 454; 65 *Id.* 619; 70 *Id.* 179; 188 S. W. 838.

*Lewis Rhoton* and *J. C. Goodrum,* for appellee.

1. The complaint and amendments allege negligence on the part of Miss Green, the admitted agent, servant and employee of defendants, and that defendants were negligent in not using reasonable care in furnishing a reasonably safe x-ray machine. The evidence shows negligence for which appellants were responsible and the jury so found, and the verdict is sustained by the evidence and should not be disturbed.

2. The verdict is not excessive. 122 Ark. 305; 35 *Id.* 492; 278 S. W. 924; 2 Bingh. 156. This case is controlled by the principles announced in 208 S. W. 924; 108 Mo. 322; 45 L. R. A. (N. S.) 640; 46 *Id.* 611. See, also, 106 Ark. 91. The instructions were really too favorable to appellants. Appellee was seriously and permanently injured, and appellants were clearly liable.

WOOD, J. The appellee brought this action against the appellants to recover damages for personal injuries. She alleged in substance that the appellants were partners in the general practice of medicine and surgery; that they owned and operated St. Luke's Hospital in the city of Little Rock, Arkansas; that she became a patient of appellants and under the advice of appellant Kirby went to St. Luke's Hospital, where a Miss Green, an employee, servant and agent of appellants, made an exposure of appellee's body to an x-ray machine; that, through the negligence and ignorance of Miss Green in exposing the body of appellee to the x-ray machine for an unreasonable length of time in the morning and again in the afternoon of the 3d day of December, 1918, and again on the following day, she was seriously burned and permanently injured. Appellee also alleged that appellants permitted Miss Green to use an old and defective screen, which, in order to obtain proper reflection for fluoroscopic examination, required a current dangerous in strength

and a dangerous and excessive length of time·in making the exposure. Other acts of negligence were alleged, but all except the above were abandond at the hearing. The appellee alleged that she had been damaged through the negligence of appellants as above set forth in the sum of $25,800, for which she prayed judgment.

The appellants answered, denying the allegations of the complaint. They set up that the injury resulted without any fault on the part of the operator and without any defect in the machine itself, and by reason of the uncontrollable nature of the x-rays.

Over the objection of appellants, the court gave instructions to the jury in which it was assumed that under the evidence the relation of master and servant existed between the appellants and Miss Green, and told the jury in effect that if they found that Miss Green was negligent in the use of the machine, and that the injury to the appellee was the result of such negligence, the appellants were liable. The court further instructed the jury, over the objection of appellants, that appellants were liable if they failed to exercise ordinary care to furnish reasonably safe appliances, provided such failure was the proximate cause of the injury to the appellee. The appellants prayed the court to instruct the jury to the effect that if the appellants exercised ordinary care in employing Miss Green to operate the x-ray machine in question, they were not liable for her negligence, if she was negligent. Appellants also asked the court to tell the jury in effect that if the appellants failed to furnish a machine that was in good condition, and if such failure resulted in injury to the appellee, appellants would not be liable for such injury, provided they exercised that care which ordinarily prudent physicians and surgeons would have exercised in the circumstances. The court refused these prayers, to which the appellants duly excepted. The trial resulted in a judgment·in favor of the appellee in the sum of $25,000, from which is this appeal.

1.　The first question is, Did the relation of master and servant exist between the appellants and Miss Green? The facts concerning this are substantially as follows: The appellants are partners in the general practice of medicine and surgery.　They maintain a hospital in the city of Little Rock, known as St. Luke's.　At this hospital they have various departments, and among them a laboratory and x-ray department, which in December, 1918, was in charge of Dr. A. C. McGill, who was in the employ of the appellants as a specialist in laboratory and x-ray work.　Doctor McGill was a graduate in medicine of Tulane University, and had made special preparation for x-ray work at Battle Creek, Michigan, and also at the Presbyterian Hospital, Chicago, Illinois.　He had been doing the x-ray work at St. Luke's Hospital since 1913, and was an experienced and skillful operator of the x-ray machine, familiar with all of its parts and accessories.　Appellants Kirby and Sheppard became associated with appellant Runyan about 1916 or 1917. Thereafter there was a great increase in the x-ray work at St. Luke's, and Miss Green was employed by appellants to assist Doctor McGill in that work.　She began to work under Doctor McGill early in 1917, and continued for about two years, and was operating the x-ray machine at the time of the injury to appellee.

Concerning the qualifications of Miss Green as an x-ray specialist, Doctor McGill, a witness for the appellee, testified that she was as competent as he; that he had given her the same instructions that he had received. "She was very careful and very efficient and had x-rayed hundreds of patients," which he estimated all the way from six hundred to a thousand.　She was not a graduate of medicine, but the testimony both for the appellants and for the appellee shows that this was not essential in order to make one an x-ray specialist.　Doctor McGill testified that "one of the best x-ray men he knew of on the face of the earth was not a doctor."　He referred to the person who operated the x-ray machine for the Mayos, "whose x-ray department was something enormous."　Doctor Kirby testified that when he was pur-

suing his medical studies in St. Louis, the man in charge of the x-ray department in the St. Louis City Hospital, and who was considered one of the best x-ray men in that city, was not a doctor.

Doctor McGill testified that the x-ray business or profession is a distinct and separate profession from that of surgery; that "it is a true specialty, as much so as surgery." He and Doctor Bathurst, another witness for the appellee, testified that in the vicinity of Little Rock it is rather the rule than the exception that the x-ray work is done by some other person than the surgeon himself; that, while a few surgeons here do their own x-ray work, it is not the rule. The testimony of appellants Kirby and Runyan was to the same effect, and further that, with the amount of surgery done by them, it would be impossible for them to personally do their own x-ray work. Moreover, none of the appellants were x-ray specialists. They were entirely ignorant of x-ray work, and were wholly dependent for such work on their x-ray department, which was under the supervision and full control of Doctor McGill and operated by him and his assistant, Miss Green.

The testimony of appellants Runyan and Kirby and of their business manager, King, shows that the x-ray department at St. Luke's Hospital is separate and distinct from the other departments of the hospital work and used for x-ray purposes by the doctors in attendance at the hospital. During the progress of the trial, when evidence concerning the competency of Miss Green was being adduced, counsel for the appellee made the following statement: "There is an allegation that Miss Green. was incompetent, but I think it has been shown here that she is competent, and there will be no argument on my part that she wasn't." Therefore, it is thoroughly established by the undisputed testimony in this record that x-ray work is a specialty, and that this work at St. Luke's Hospital was maintained and operated as a separate and distinct department in charge of competent x-ray specialists. The appellee does not now controvert this, and we have only set forth the above facts because we have found

them helpful in the solution of another question, namely:
In an action by a patient against physicians and surgeons
to recover damages for their alleged malpractice, caused
by the alleged negligence of an x-ray specialist whom
they had employed to assist them, does such specialist
stand in the same relation to the physicians who em-
ployed him as if he had been another physician employed
to give the patient necessary attention in their absence?

The question is a most interesting and important
one, and it has given us the greatest concern. It is one
of first impression in this State, and counsel have not
cited, nor has our own research discovered, any case else-
where that decides the exact question. A correct answer
to the question requires a brief resume of the history of
the x-ray, the field it occupies, and what it has accom-
plished in the realm of modern science.

In 1895 Professor Roentgen, a celebrated German
physicist, discovered the x-rays, or, as they are sometimes
designated, "Roentgen" rays. Roentgenology, so called
in honor of Professor Roentgen, is the science which
treats of the x-ray and its uses and the art of applying it.
Those who devote themselves to the study and practice
of this specialty as a profession are called Roentgenolo-
gists. The use of the x-ray other than in the sciences of
medicine and surgery is practically negligible. While
yet comparatively in its infancy, nevertheless giant
strides have been made in the development of Roentgen-
ology. The apparatus necessary for the application of
the x-ray to the human body in the diagnosis and treat-
ment of diseases has been brought up from a crude be-
ginning to seemingly the highest perfection and stand-
ardization. So that now, through the work of the x-ray
specialist, or Roentgenologist, the mysteries of numer-
ous diseases hidden beneath the tissues of the human
body have been uncovered. Many of these are diseases
of the most malignant type, which had hitherto baffled
the skill of the best physicians and surgeons. Today
they are able to correctly diagnose and successfully treat
them solely because of the aid given by the x-ray special-
ist. Even in the last quarter of a century, wonderful

progress has been made in the sciences of medicine and surgery, and the science of roentgenology has been their most helpful ally.

Dr. Sinclair Tousey of New York City, in an article on the x-ray, 29 Americana, page 595, said: "The x-ray has led to one of the most important discoveries in modern science. It has shown that many diseases of the type of rheumatism, arthritis, neuritis and myositis, also endocarditis, digestive troubles, including ulcer of the stomach and many other symptoms and lesions of a varied character, frequently have their origin in tooth infection. * * * Such infection is readily disclosed by an x-ray examination, and easily cured by the dentist.".

Doctor Osler, one of the most eminent medical authorities in the world, mentions twenty-five diseases, some of them hitherto incurable, in which the x-ray is resorted to, both for successful diagnosis and treatment, and others in which it is most helpful. Principles and Practice of Medicine—Osler, Index, X-ray, p. 1224.

In an article by Dr. R. B. Carman of the section of Roentgenology in the Mayo clinic, is the following: "During the year 1919 the examinations made in the department of Roentgenology numbered 50,668, as follows: Kidney, ureter and bladder, 6,088; bone, 12,129; chest, 17,301, and gastro-intestinal tract, 11,825." American Journal of Roentgenology for December, 1920, p. 557. Other authority for the above observations may be found in Medical Jurisprudence, Forensic Medicine and Toxicology. Witthaus & Becker, vol. 3, p. 733, *et seq.;* Keen's Surgery, vol. 5, p. 1143; Industrial Medicine and Surgery, Mock, p. 60, *et seq.*, and p. 568 *et seq.;* Enc. Brittanica, vol. 28, p. 887; X-ray in Medicine and Surgery, New International Enc., vol. 23, p. 850; American Journal of Roentgenology for December, 1920, p. 584; 29 Americana, X-ray, p. 595; The Roentgen Rays in Medical Work, Walsh (3 ed.), Preface and Appendix 2, p. 301.

In Witthaus & Becker, volume 3, page 799, it is said: "Personal responsibility and liability to a patient for damages caused by the use or misuse of the x-ray rest upon the same principles of law as any other branch of

medicine or surgery. The same rules, so far as malpractice is concerned, must be applied as laid down in our court of last resort, to guide the medical and surgical practitioner.'' See also 21 R. C. L., p. 386, § 31. For the rules applicable to physicians and surgeons as announced by our court, see *Dunman* v. *Raney,* 118 Ark. 337.

We conclude, therefore, that, because the science of roentgenology is so inter-related with the sciences of medicine and surgery in the diagnosis and treatment of human diseases, it should be classed in the same category with those sciences. And the x-ray specialist, or Roentgenologist, must be placed in the same class with the physician and surgeon because of the peculiar knowledge and technic that he must possess, and because in the practice of his profession such knowledge and technic is dedicated almost exclusively to the aid of the physician and surgeon in the diagnosis and treatment of diseases of the human body. The x-ray specialist, or Roentgenologist, can not be placed in the same class with the chauffeur or elevator operator, as contended by counsel for appellee, nor even with engineers, electricians, and other employees whose employment contemplates the exercise of the peculiar skill and technic possesesd only by those who are engaged in and qualified for their line of work. Because all such employees are under contract to exercise their peculiar skill to produce certain definite and specific results which are known in advance of employment. In all such cases the employer, by virtue of the express or implied agreement ''retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished; or, in other words, not only what shall be done, but how it shall be done.'' *Singer Mfg. Co.* v. *Rahn,* 132 U. S. 518, 32 Law. Ed. 440; *Bailey* v. *Troy & B. R. Co.,* 57 Vermont 252, 52 Amer. Rep. 129; Wood, Master and Servant, § 311; *DeForrest* v. *Wright,* 2 Mich. 368; 1 Labatt on Master and Servant (2 ed.), pages 9 and 222, and other authorities cited in brief for appellants. Unless expressly so provided, such employees have not the right at all times in the prosecution of their work to exercise

their own independent judgment and discretion as to the mode and manner in which it shall be done, and they are not engaged in an employment which has for its object the treatment of the manifold diseases of our human flesh and the alleviation of the physical pain and suffering of mankind. Whereas, as we have already shown, the x-ray specialist, or Roentgenologist, like the physician and surgeon, unless he expressly contracts to produce certain results, has the right to, and must at all times, act according to his independent judgment and discretion in the exercise of his skill and learning in the treatment of human diseases. The very nature of his profession and the character of his contract of employment involves this right.

Such being our conclusion, it inevitably follows under the doctrine of our own cases that the relation of master and servant can not exist between physicians and surgeons who are not x-ray specialists themselves and the x-ray specialist, or Roentgenologist, whom they employ to assist them in the diagnosis and treatment of diseases.

In *Arkansas Midland Railroad Co.* v. *Pearson,* 98 Ark. 399, we said: "A physician can not be regarded as an agent or servant in the usual sense of the term, since he is not and necessarily can not be directed in the diagnosing of diseases and injuries and prescribing treatment therefor, his office being to exercise his best skill and judgment in such matters, without control from those by whom he is called or his fees paid."

In the case of *Keller* v. *Lewis,* 65 Ark. 578, Doctor Keller was called in by Lewis to treat his son, who had sutained a dislocation of the arm. Doctor Keller attended and gave the patient temporary treatment, and, being about to leave the city of Hot Springs, recommended that the patient be taken to another physician whom he had engaged to look after his patients in his absence. Doctor Keller was sued for the alleged negligence of the other physician. In that case we held that the employment of the other doctor constituted an inde-

pendent contract, and that Doctor Keller was not responsible for the negligence or want of skill of that doctor.

In the still later case of *Norton* v. *Hefner,* 132 Ark. 18-23, Doctor Norton was called by Hefner to perform a surgical operation upon his wife. Doctor Norton performed the operation and arranged with a young physician at the hospital to look after the patient until she recovered. An action was brought against Doctor Norton to recover damages for the alleged negligence of the doctor whom Doctor Norton had selected to take charge of his patient. In disposing of that case we cited and quoted from the above cases and said: "Appellant (Norton) was not guilty of negligence in the performance of the operation, nor in the selection of a physician to continue the treatment after he left the city. Not being negligent in those respects, he can not be held responsible for the negligence of the other physician who was left in charge merely because the other physician took charge on his suggestion and arrangement." We further said: "This view of the law is based upon the theory that the doctrine of *respondeat superior* applies only in case of the negligence of a servant who acts under the direction and control of the master (*De Forrest* v. *Wright,* 2 Mich. 368), and does not apply to a physician or other professional man who, when employed, acts upon his own initiative without direction from others."

The fact that the x-ray specialist for whose negligence recovery is sought was working at St. Luke's Hospital in the x-ray department equipped by the appellants for such work, does not affect the character of employment between appellants and Miss Green, so far as the performance of her work is concerned. Under the evidence, the appellants had no more control over her as to the manner and method she used in making her investigations, interpretations and reports, than if she had maintained an office down town and had been employed by appellants to do all their x-ray work at that place with apparatus and equipment not furnished by appellants. So far as the manner and method of her work was concerned, she was no more under the control of the appel-

lants in the one case than she would have been in the other. For illustration, would the Mayos, in whose x-ray department over 50,000 patients were examined in one year, be liable to any of these patients in damages for injuries caused by the negligence of their Roentgenologists, because of the fact that they were maintaining an x-ray department at their institution fully equipped by themselves, instead of committing that work to x-ray specialists on the outside? We are convinced that they would not be liable unless they had been negligent, that is, had failed to exercise ordinary care to employ competent Roentgenologists, and to furnish the proper apparatus. The difference between the Mayos and the appellants in these respects is only in numbers. For the business of appellants had grown to such an extent as to make it necessary, in order to meet the requirements of their practice, to maintain at their hospital a separate and distinct department of Roentgenology fully equipped, and to employ for all their time two Roentgenologists for that department.

To sustain their contention that appellants are liable for the alleged negligence of Miss Green, counsel for the appellee rely upon the following cases: *Gross* v. *Robinson*, 218 S. W. 924; *Longan* v. *Weltmer*, 180 Mo. 322; *Palmer* v. *Hunnister*, 45 L. R. A. (N. S.) 640; *Davis* v. *Kerr*, 46 L. R. A. (N. S.) 611.

In *Gross* v. *Robinson*, the defendant, Gross, himself had exposed the plaintiff to the x-ray machine, two or more times, and Gross claimed to be an x-ray specialist. After failing to secure a picture, he called in another x-ray specialist, who, in the presence of Gross, made another exposure, and failing to get the desired picture, Gross continued himself to make further exposures, and also after again failing, called in another person who made no pretense to the experience and skill of an expert in the medical profession, to make another exposure. Of course, under such a state of facts, it was a question for the jury to say whether the defendant was negligent, as the Supreme Court held. The facts bear no analogy to the case at bar. In the case of *Longan* v. *Weltmer*, the

defendants "held themselves out, not as practicing physicians, but *magnetic healers,* claiming and pretending to cure all mental and physical ailments." The facts show that case has no application to the present case. The other cases were actions against surgeons for alleged malpractice in leaving sponges in wounds after an operation. One of the defenses was that the reason the sponges were not removed was because of the negligence or oversight of the attending nurses at the hospital in failing to make proper count of the number of sponges that had been placed in the wound, and in their misleading the surgeon as to the number when he came to remove the sponges. It was the custom at one of the hospitals for the head nurse in attendance at the operation to count the number of sponges that were placed in the wound. Of course, in these cases it was held that the surgeons, whose duty it was to remove the sponges, as a part of the operation, had no right to rely upon the accuracy of the count made by the nurses. The nurses had expert knowledge as physicians or surgeons and were under the immediate direction of the surgeon. To state the facts is enough to clearly distinguish all of the above cases from the case in hand.

It is necessary, according to certain distinguished professors of Roentgenology and writers on the subject, that one should possess some knowledge of the science of pathology in general, and of anatomy and physiology in particular, in order to constitute such one a competent x-ray specialist. See preface to "Roentgen Interpretation"—Doctor Holmes of the Harvard Medical School and Doctor Ruggles of the University of California Medical School. There is no express allegation that Miss Green was incompetent, and that appellants were negligent in employing her because she was incompetent. There was no proof that she was incompetent. On the contrary, as we have shown, the undisputed testimony proved that she was an excellent technician in the art of applying the x-ray machine and in interpreting the revelations of the fluoroscopic examinations. As we have stated, counsel for the appellee expressly admitted that

she was competent. Therefore, although she was not a graduate of medicine, we must assume that she was competent, *i. e.,* that she possessed all the technique and whatever knowledge of medical science was necessary to render her a proficient x-ray specialist. It therefore appears from the undisputed facts of this record and the law applicable thereto that appellants are not liable for the alleged negligence of Miss Green.

2. The next questions are: Was the screen used by Miss Green for making fluoroscopic examinations of the appellee defective, and, if so, were appellants negligent in failing to exercise ordinary care to furish a perfect screen, and was such negligence, if any, the proximate cause of the injury?

The testimony concerning these issues is substantially as follows: Doctor McGill testified that, about seven months before the injury to appellee, he discovered that the fluoroscopic screen was defective because it strained his eyes. His testimony and the testimony of Doctor Hill was to the effect that more voltage would have to be used with a defective screen, and the exposure would have to continue for a longer time. Doctor McGill testified that he was a chronic complainer, and it seemed to him he had complained a time or two of the defective screen. He was asked to whom he complained and answered: "Let me see, now, I would naturally go to Doctor Runyan or Mr. King (the business manager), one or the other." Notwithstanding the defect in the screen, he considered the machine safe, and continued to operate it after the defect was discovered and x-rayed from that time, using the same screen, about six hundred people before appellee was injured, and more than one hundred afterward before the purchase of the new screen. He would not have used it if he had considered it dangerous. He had full power to order anything he wished and was instructed to order the best.

Doctor Runyan and Mr. King both testified emphatically that Doctor McGill did not notify them of any defect in the screen, and Doctor Runyan testified that Doc-

tor McGill was expected to keep the x-ray apparatus in perfect condition. He had full authority to order anything he needed for that purpose. The appellants and their business manager did not know anything about the x-ray machine or its accessories.

The appellee and her mother and father testified that appellee was exposed three different times to the x-ray machine, two the first day, once in the morning and again in the afternoon, and again on the following morning. Each time appellee was kept exposed to the rays for thirty or forty minutes. Appellee was exposed each time both for the x-ray picture and the fluoroscopic examinations. During the first exposure her mother was present, and during the second exposure Miss Green had appellee's mother and father to come in and showed them all the parts of her body being exposed, and the third time likewise pointed out all the parts and explained them to both mother and father. During the second exposure appellee felt unpleasant sensations—an itching. She told Miss Green about it and asked her to wait until she could scratch it, but Miss Green continued to look and look, and finally after she stopped looking, appellee still had the itching and tingling in her back that felt like a thousand needles sticking in her back. She told Miss Green about it. Miss Green advised her to come back the next morning, and then exposed appellee again for thirty or forty minutes. There was the same itching as the day before, only a little worse. Appellee was burned from her neck to below her waist line, the deepest part of the burn being in the small of back, which was a very severe burn.

Mrs. Chamberlain, formerly Miss Green, the operator, and only other eye witness, testified: That the usual method was to darken the room and wait until the eyes became accustomed to the darkness, which sometimes takes several minutes: then turn the current on and look through the patient standing; then have them recline to make the plates for the pictures. Before the current is turned on, and while patients are standing, they frequently complain that they are being burned.

Witness had been x-rayed many times herself and knew personally, from her experience in the x-ray business, that one feels no burning sensations when the current is turned on. She did not remember whether appellee complained of sensations of pain while she was being exposed to the x-ray, but if she had witness would have given it no attention because it was purely imaginary. Witness had x-rayed so many people she could not testify definitely as to exactly what she did in Miss Goodrum's case. The usual method was to turn the current on only for a few minutes, and witness was satisfied that she had treated Miss Goodrum just as she did all the other patients in that respect. Doctor McGill, who had examined appellee's back after the burn, said that taking into consideration appellee's size, if the machine had been in proper condition and had been properly operated one couldn't see any reason why she should have been burned. He further stated that he had seen some of the finest experts who, in using the best machines, had not only burned themselves, but other people. Doctor Bathurst also testified that the people who are the most experienced are the people who sometimes have trouble; that is one of the unfortunate things to deal with, but only one in ten thousand will come up with trouble. Doctor Hill testified that he had x-rayed over 7,000 patients and had never burned any one, and that there was no excuse now for burning a person during an x-ray exposure.

To get the best results the time required for the exposure is from two to four seconds. Both Doctors Hill and McGill, especially the latter, explained in detail the x-ray machine and its accessories, and their testimony shows that, in a properly equipped machine, the operator can increase or diminish at will the current that produces the rays with which the fluoroscopic observations and the pictures are made. The electricity that goes into the body is measured, not by volts, but millamperes. They are measured accurately and can be turned on or off instantly. Doctor McGill selected the machine that was in use, and "it was first class in every respect, except the screen."

The principles of law applicable to the facts stated are well established. Since appellants maintained an x-ray department at St. Luke's Hospital, it was their duty to exercise ordinary care to see that this department was equipped with such apparatus as was generally approved by Roentgenologists as best adapted for the proper diagnosis and treatment of diseases; also, to exercise such care to provide competent specialists to do the work in that department. Ordinary care for the successful management of such institution means a very high degree of care because it has to do with the lives and health of human beings. The x-ray machine, of the highest type and manipulated by a competent expert, is of inestimable value to mankind, but otherwise it is an exceedingly dangerous agency. This duty of appellants to exercise ordinary care to employ competent Roentgenologists and provide safe apparatus for their x-ray department could not be delegated to another. If, therefore, there was in use in appellant's x-ray department a defective screen, which appellants or their chief Roentgenologist, Doctor McGill, knew to be defective, or by the exercise of ordinary care should have known to be defective, and if the use of such defective screen was the proximate cause of the injury to appellee, then appellants were liable to her in damages. Doctor McGill, so far as the duty of furnishing the necessary apparatus was concerned, was the agent, the *alter ego,* of the appellants, and his knowledge was their knowledge. For this purpose he was at all times under the immediate control of the appellants and could not exercise his independent judgment and discretion. While the testimony of Doctor McGill tends to prove that the use of a defective screen would result in an imperfect fluorescence and would probably cause a longer exposure and an increase of current, yet his testimony further shows that he did not consider that the defect in the screen in use was one that could in any manner cause or contribute to the injury of which the appellee complained; for he further states most emphatically that, if he had considered the machine unsafe or dangerous, he would not have used

the same, and, to show that this was his sincere belief, after the discovery of the defect, he used the same screen in making 600 or 1,000 exposures. To further show that he did not have knowledge of any defect which he considered dangerous or unsafe, he stated that the defect might cause a second or third exposure; but, in view of the fact that these exposures were from two to four seconds, witness manifestly did not regard the screen unsafe or dangerous, even though it might cause such additional exposures. The jury should not be allowed to speculate on probabilities, in the face of the positive testimony of the witness himself that he did not consider the machine unsafe or dangerous. *St. L., I. M. & S. Ry. Co.* v. *Owens,* 103 Ark. 61-64. Therefore, it occurs to us that all reasonable minds must reach the conclusion that there was no unsafe or dangerous condition of the screen. But, if we are mistaken in this, we are of the opinion that, whatever may have been the defect in the screen, it was not the proximate cause of the injury to the appellee.

This brings us to a consideration of the question as to whether or not Miss Green was negligent and, if so, whether such negligence was the proximate cause of the injury. The doctrine of *res ipsa loquitur* does not apply in such cases because the testimony shows that, on account of the idiosyncracies of the x-ray machine, one person of a certain type and temperament would be susceptible to a burn while another person of a different type, under the same circumstances, would not be burned. Moreover, it is shown that burns do occasionally occur, in the ordinary course of the exposure, in spite of the highest diligence and skill to prevent them. 4 Labatt's Master and Servant, p. 4864, §§ 1601 (834) and cases in note; *Sweeney* v. *Erving,* 35 App. D. C. 57, 43 L. R. A. 734 (N. S.); *Wilkins* v. *Brock,* 81 Vt. 333, 70 Atl. 572.

The burden of proof was upon the appellee to show negligence on the part of Miss Green and that such negligence was the proximate cause of appellee's injury. Appellee has fully met this burden. While Miss Green testified that she was satisfied she followed the custom of the office, which was to expose a patient only a few mo-

ments at a time, she did not remember specifically what she did in appellee's case. She did not remember whether appellee complained of burning sensations during the exposure or not, but, if appellee had done so, she would have paid no attention to it because she regarded such sensations as imaginary. On the other hand, the testimony of appellee, her mother and father, showed that appellee was exposed continuously for thirty or forty minutes, and that she complained of itching and burning sensations. The testimony of Doctor Hill showed that the operator should immediately respond to such complaints on the part of the patient and disconnect the current, and that subsequent exposures in such cases should not be had until some weeks afterward. The proof was abundantly sufficient to sustain the verdict as to the negligence of Miss Green. No doubt, the jury believed, and they were justified in believing, that Miss Green became interested and absorbed in explaining the mysteries of her science and art to the mother and father of Miss Goodrum and thus unconsciously let the time go by for thirty or forty minutes while, with disastrous effect, the rays were penetrating the back of the appellee. That this negligence of Miss Green was the proximate cause of appellee's injury there is not the shadow of a doubt. Even if there had been a defect in the screen which caused a longer time of exposure and greater current than, in the usual course, the undisputed testimony shows that this would have only necessitated a second or third exposure of two to four seconds each, but Miss Green, according to the evidence, exposed the appellee for eighteen or twenty-four hundred seconds. Besides, she failed to heed the warning and shut off the current when the first danger signal was given by the appellee. The occurrence was most unfortunate and deplorable, but it follows from what we have said that the appellants are not liable, and, inasmuch as the testimony seems to have been fully developed, the judgment will be reversed and the cause dismissed.

SMITH, J., dissenting.