**Daniel KENNING and Cyndia Kenning, heirs-at-law of Matthew Kenning, deceased, Plaintiffs,**

**v.**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY and Sharon Huemmer Pritchard, M.D., Defendants.**

**Civil No. 97–3027.**

United States District Court, W.D. Arkansas, Harrison Division.

Dec. 24, 1997.

---

Cynthia O. MacPherson, MacPherson Law Firm, Mountain Grove, MO, Frank H. Bailey, Bailey Law Firm, Mountain Home, AR, Thomas W. Cline, Gainesville, MO, for Daniel Kenning, Cyndia Kenning.

Walter Cox, Davis, Cox & Wright, Fayetteville, AR, for St. Paul.

Sidney P. Davis, Fayetteville, AR, for Dr. Pritchard.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

Currently before this court is separate defendant St. Paul Fire and Marine Insurance Company's motion for partial summary judgment and plaintiffs' response thereto. For the reasons set forth below, this court finds that said motion should be and hereby is granted.

### I. FACTS

Plaintiffs contend that their son, Matthew Kenning, died as a result of a violation of 42 U.S.C. § 1395dd, commonly referred to as the "Patient Anti–Dumping Act." Specifically, plaintiffs contend that Matthew had an emergency medical condition when he sought treatment from Baxter County Regional Hospital ("Baxter"), that Baxter knew he had an emergency medical condition, and that Baxter discharged him without stabilizing his condition. Plaintiffs also assert that Dr. Sharon Pritchard misdiagnosed Matthew's condition and that her misdiagnosis was the proximate cause of his death.[1]

---

1. Plaintiffs bring this direct action suit against St. Paul Fire and Marine Insurance Company pursuant to Arkansas Code § 23–79–210, which permits a direct cause of action against the liability insurer of a non-profit corporation for the negligent acts of the agents or employees of the non-profit corporation. Ark.Code Ann. § 23–79–210 (Michie 1992). It is undisputed that Baxter is a non-profit corporation.

On March 25, 1997, Daniel Kenning took his ten year old son, Matthew Kenning, to the emergency department at Baxter in Mountain Home, Arkansas. Plaintiffs were concerned about their son's persistent cough. Mr. Kenning states that he took his son to Baxter because he knew Baxter had emergency room services and would provide his son with the best care. *Plaintiffs' Exhibit "R,"* at 2. Mr. Kenning had experience with Baxter when he worked with the Ozark County's Sheriff's Office and from when his two children were born. *Id.,* at 1.

A registered nurse, Kathy Cox, examined Matthew and took his temperature, heart rate, respiratory rate, blood pressure, etc. *Defendant's Exhibit "2,"* at 9–12. In addition, Ms. Cox asked Mr. Kenning all of the usual questions regarding Matthew's medical history, allergies, current medications, etc. *Id.,* at 13–15. Ms. Cox states that when she examined Matthew he had a 100.7° temperature and was pale. *Id.,* at 9, 15. Ms. Cox determined that Matthew's breathing was labored—he had a respiratory rate of sixty— but that his lungs were clear. *Id.,* at 16. After performing her examination, Ms. Cox took Matthew to an examination room in the emergency department to await one of the physicians on duty, Dr. Sharon Pritchard.[2] *Id.,* at 18.

Dr. Pritchard also examined Matthew and ordered the following tests: a complete blood count; a chest x-ray; and a blood culture. When Dr. Pritchard examined Matthew's chest x-ray she discovered that the left atrium of his heart was enlarged. *Plaintiff's Exhibit "D,"* at 16. Dr. Pritchard also took Matthew's respiratory rate and she states that it had improved since the time of Ms. Cox's assessment. *Plaintiffs' Exhibit "H,"* at 10. However, Dr. Pritchard did not record this change in Matthew's respiratory rate, which was in violation of Baxter's policy.

After examining Matthew, Dr. Pritchard phoned Dr. Yoland Condrey, a pediatrician, to discuss Matthew's condition and treatment options. *Defendant's Exhibit "A,"* at 22, 23. Dr. Coundrey was in the hospital at the time,

but she did not come down to the emergency room to examine Matthew. Dr. Pritchard states that she and Dr. Condrey agreed on the decision to discharge Matthew. *Id.,* at 22. Dr. Pritchard asserts that she did not feel it was necessary to admit Matthew because she determined, in her clinical judgment, that outpatient therapy would be the best for Matthew. *Id.,* at 31. Thus, Dr. Pritchard ordered medications to be given to Matthew at Baxter and prescribed additional medications to be administered to Matthew at home.

Dr. Pritchard diagnosed Matthew as having pneumonia and anemia and advised Mr. Kenning that he should take his son home to rest. *Defendant's Exhibit "1,"* at 1. She told Mr. Kenning that he should make an appointment to see Dr. Condrey in a few days.

Dr. Pritchard states that she believed that Matthew's condition was stable at the time he was discharged from Baxter on the evening of March 25, 1997. The records indicate that Matthew's condition was considered stable and that he walked out of the hospital accompanied by a member of his family (Mr. Kenning). *Defendant's Exhibit "1,"* (Baxter County Regional Hospital Emergency Department Nursing Record).

Matthew's chest x-ray film was examined on the morning of March 26, 1997, by Dr. G. Regnier. Dr. Regnier stated in his report that "[f]ilms of the chest made on this child … show an abnormally large heart and shows marked pulmonary vascular changes of infiltration or congestion. At this time, there is no evidence of any fluid accumulation …. This child appears to have a serious disease process." *Defendant's Exhibit "1,"* (Baxter County Regional Hospital Radiology Consultation Request). Dr. Condrey states in her deposition that, if she had seen the x-ray, she would have probably admitted Matthew, given his vital signs and low respiratory rate. *Defendant's Exhibit "B,"* at 9.

Unfortunately, no one contacted plaintiffs regarding the results from Dr. Regnier's consultation. Thus, plaintiffs had no indication that their son's condition was life-threaten-

**2.** Dr. Pritchard was chosen to examine Matthew because she was the "red doctor" on duty. The "red doctor" on duty at Baxter takes the more serious cases, while the "blue doctor," or the back-up doctor, takes the other, less serious cases. *Defendant's Exhibit "5,"* at 44.

ing. On March 26, 1997, the day after Matthew was discharged from Baxter, he stopped breathing and was pronounced dead at 1:18 p.m.

Plaintiffs contend that Matthew's condition was an "emergency medical condition" and that Dr. Pritchard should not have discharged him from Baxter on the night of March 25, 1997. Plaintiffs offer the affidavit of Shane Bennoch, M.D., as proof that Matthew's condition was an emergency. Dr. Bennoch states that, in his opinion, according to Matthew's chart and the chest x-ray, Matthew had an "emergency medical condition." *Plaintiff's Exhibit "E,"* at 2. Specifically, Dr. Bennoch states that "[p]neumonia and anemia in a ten year old child with an enlarged heart is an 'emergency medical condition.'" *Id.*

Matthew Kenning did not have insurance. However, there is no evidence that Mr. Kenning was advised that he had to pre-pay for the medical services provided to his son, or that he was required to make a deposit or make any financial arrangements prior to Matthew receiving treatment at Baxter. Plaintiffs received a statement from Baxter for emergency room services a few days after Matthew was treated.

Dr. Pritchard states that she did not know at the time that Matthew was a "private pay" patient. *Defendant's Exhibit "5,"* at 41. However, Matthew's admittance form indicates that he was a "private pay" patient. *Defendant's Exhibit "1,"* at 1.

Plaintiffs contend that Dr. Pritchard was negligent in misdiagnosing Matthew. Plaintiffs assert that Dr. Pritchard is an agent of Baxter and thus, Baxter is vicariously liable for her negligence.

Plaintiffs seem to concede that Dr. Pritchard is an independent contractor. However, plaintiffs contend that Baxter can still be held liable for Dr. Pritchard's negligence under the theory of apparent authority or ostensible authority.

Dr. Pritchard has a contract with Dr. Pat Black, P.A. ("Black P.A.") to work as an emergency room physician at Baxter. Dr. Pritchard has no oral or written employment contract with Baxter.

Black P.A. is a professional association of physicians licensed to practice medicine in Arkansas. Black P.A. has a professional services agreement (the "Agreement") with Baxter to provide emergency room services. The Agreement provides that Black P.A. will be responsible for providing all professional emergency room services to Baxter, for responding to all Baxter codes, and for consulting with Baxter's staff when appropriate. *Exhibit "A" to Defendant's Exhibit "4,"* at 1. The Agreement provides that Black P.A. shall receive 90% of Baxter's gross billings for emergency room services plus additional fees for second on-call coverage in the emergency room. *Id.* at 5. The Agreement requires that each physician of Black P.A. have his or her own malpractice liability insurance coverage in the amount of $500,000. *Id.* In addition, the Agreement states:

> Black P.A. and [Baxter] are independent contractors for purposes of this Agreement. No employee or agent of one party shall be considered an employee or agent of the other party. Nothing in this Agreement shall create a partner, principal-agent, joint venture, or landlord-tenant relationship, or shall allow [Baxter] to exercise control over the professional medical judgment or the manner by which Black P.A. performs medical services under this Agreement . . . .

*Id.*

Dr. Pritchard states that she is an independent contractor, that she is paid an hourly fee for her services as an emergency room physician at Baxter by Black P.A. and that she does not receive a salary from Baxter. *Defendant's Exhibit "5,"* at 45–46. Dr. Pritchard states that she was not wearing a name tag or any other identifying material on the night of March 25, 1997, that stated she was an employee of Baxter. *Id.* at 43.

As evidence that Baxter represented Dr. Pritchard to be its agent, plaintiffs point to the billing statement they received from Baxter for emergency room services rendered. It states at the top "Baxter County Regional Hospital" and it does not contain any reference to Black P.A. *Exhibit "A" to Plaintiffs' Exhibit "R."* In addition, plaintiffs assert that all of Matthew's medical records from Baxter are labeled or stamped "Baxter County Regional Hospital."

Plaintiffs also submitted various pamphlets and brochures that contain information about Baxter. Plaintiffs point to the fact that the brochures state that Baxter has an emergency room department staffed with "in-house physicians." *See generally, Plaintiffs' Exhibits N, O, P and Q.* There is no evidence, however, that Baxter had any involvement with the production of those pamphlets or brochures.

Finally, Mr. Kenning states that there were no signs present in the emergency room stating that the physicians were not Baxter's employees. *Plaintiffs' Exhibit "R,"* at 1. Mr. Kenning states that no one told him that Dr. Pritchard was not an employee of Baxter. *Id.* He asserts that when Dr. Pritchard first came into Matthew's examination room she said, "I'm Dr. Pritchard with Baxter County Regional Hospital." *Id.,* at 2.

The Health Care Financing Administration ("HCFA") conducted an investigation of plaintiffs' complaint and determined that no violation had occurred in connection with the care and treatment of Matthew Kenning. *Defendant's Exhibit "3."* However, Mr. Kenning sent HCFA additional information regarding Baxter's conduct and by letter dated November 25, 1997, HCFA stated that they would notify Mr. Kenning as to whether the new information will cause a change in their initial determination. *Plaintiff's Exhibit "A."*

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56. The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. U.S.,* 600 F.2d 725, 727 (8th Cir.1979). In *Counts v. M.K.-Ferguson Co.,* 862 F.2d 1338 (8th Cir.1988), the court, reviewing the burdens of the respective parties, stated:

[T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.,* "[to] point[] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.,* at 1339, *quoting, City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of all the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.,* 883 F.2d 594, 598–99 (8th Cir. 1989) (*citing Trnka v. Elanco Products Co.,* 709 F.2d 1223, 1225 (8th Cir.1983)).

### B. EMTALA Claim

The Emergency Medical Treatment and Active Labor Act ("EMTALA") was enacted in 1986. The Act is commonly referred to as the "Patient Anti–Dumping Act."

EMTALA imposes two primary obligations on hospitals. First, it requires that when an individual seeks treatment from an emergency room, "the hospital must provide for an appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a) (Supp.1997).[3] Second, if the hospital determines that the individual has an "emergency medical condition," then the hospital must either "stabilize the medical condition" or transfer the individual to another medical facility. 42 U.S.C. § 1395dd(b)(1) (Supp.1997).

The statute applies to "participating hospitals", *i.e.*, those hospitals which have executed provider agreements under the Medicare program. 42 U.S.C. § 1395dd(e)(2) (Supp. 1997). There is no dispute that Baxter is such a hospital. In addition, any individual who suffers personal harm as a direct result of a hospital's violation may bring a civil action against the hospital for damages. 42 U.S.C. § 1395dd(d)(2)(A) (Supp.1997).[4]

The Eighth Circuit recently addressed the scope of EMTALA and stated that "the purpose of the statute was to address a distinct and rather narrow problem—the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them." *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996) (*on rehearing en banc*). "EMTALA is not a federal malpractice statute and it does not set a national emergency health care standard; claims of misdiagnosis or inadequate treatment are left to the state malpractice arena." *Id.*, at 1137 (*quoting, Summers v. Baptist Medical Center Arkadelphia*, 69 F.3d 902, 904 (8th Cir.1995) (*rehearing en banc granted, opinion vacated*) (January 18, 1996)).

■ The Eighth Circuit held that 42 U.S.C. § 1395dd(b)(1) "applies only if. the hospital *determines* that the individual has an emergency medical condition." *Summers*, 91 F.3d at 1141 (internal quotation marks

omitted) (emphasis supplied in original). In *Summers*, the hospital never perceived that the patient was suffering from an emergency medical condition, thus, the duty to stabilize never arose. *Id.* Therefore, a hospital must have actual knowledge of the individual's unstabilized emergency medical condition if a claim under EMTALA is to succeed. *Id.* (citations omitted).

The statute defines emergency medical condition as a medical condition such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual in serious jeopardy. 42 U.S.C. § 1395dd(e)(1)(A) (Supp.1997). It is obvious in hindsight that Matthew had an emergency medical condition when he sought treatment from Baxter on the night of March 25, 1997. However, a hospital's obligation to stabilize a patient only arises if the hospital *perceives* that the patient is suffering from an emergency medical condition. If, after the hospital performs the appropriate medical screening, it determines that no emergency medical condition exists, EMTALA obligations cease.

■ In this case, the court believes that there is no genuine issue of material fact as to whether Dr. Pritchard perceived Matthew's condition to be an emergency medical condition on the night of March 25, 1997. Dr. Pritchard examined Matthew and diagnosed him with pneumonia and anemia. She looked at his chest x-ray and saw that the left atrium of his heart was enlarged. She took his respiratory rate and found that it had improved. Then, based on her clinical judgment, she made a determination that Matthew's condition was stable. Whether Dr. Pritchard's determination was medically correct, or whether Dr. Pritchard was negligent in her diagnosis is not an issue to be determined under EMTALA. EMTALA is not concerned with the standard of care or with a misdiagnosis, but only with compliance with the procedures.

---

**3.** In their complaint, plaintiffs alleged that Baxter failed to provide Matthew with an "appropriate medical screening" as required by 42 U.S.C. § 1395dd(a). However, plaintiffs have conceded they cannot prove that Baxter failed to provide an appropriate medical screening. Therefore, we will not address this issue.

**4.** It is clear that EMTALA does not provide a cause of action against the treating physician. *King v. Ahrens*, 16 F.3d 265, 271 (8th Cir.1994).

Plaintiffs point to their Exhibit "B" which they contend demonstrates that Dr. Pritchard perceived Matthew to have an emergency medical condition. Plaintiffs' Exhibit "B" is a copy of a "Physician Review Outline" that indicates Matthew had an emergency medical condition. *Plaintiffs' Exhibit "B."* This outline, however, was not prepared by Dr. Pritchard, or any member of Baxter's staff. It was prepared by a physician in connection with HCFA's review of Baxter's compliance with EMTALA's procedures in connection with the care and treatment of Matthew.

Plaintiffs refuse to acknowledge that Dr. Pritchard made an actual diagnosis in Matthew's case and determined that he was stable. As stated above, whether that diagnosis was medically sound, in light of the fact that Matthew died less than twenty-four hours later, is an issue for the jury. The outline may be helpful to plaintiffs in pursuing their negligence claim against Dr. Pritchard, but it is not relevant as to whether there was a violation of EMTALA.

Plaintiffs also point the court to the fact that Dr. Pritchard did not record the change in Matthew's respiratory rate and that such omission was in violation of Baxter's policy. Even if we conclude that Matthew's respiratory rate never actually improved, and that Dr. Pritchard lied in her deposition when she stated that it did, we do not believe that it would be enough to create a genuine issue of material fact as to whether Dr. Pritchard determined that Matthew had an emergency medical condition.

There is no evidence that indicates that Dr. Pritchard or any member of Baxter's staff treated Matthew any different than they would have treated an insured patient. There is no evidence that demonstrates that Matthew was discharged or "dumped" because of his "private pay" status.

"[EMTALA] does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers v. Nash General Hosp., Inc.,* 78 F.3d 139, 145 (4th Cir.1996) (citation omitted). Otherwise, EMTALA would become coextensive with malpractice claims for negligent treatment. *Id.*

Therefore, we conclude, plaintiffs' claim under EMTALA fails. The court believes that plaintiffs' claims are ultimately charges of negligence and as such, are not actionable under EMTALA.

## C. *Employment Status of Dr. Pritchard*

Plaintiffs contend that Dr. Pritchard was negligent in misdiagnosing Matthew and that as an agent of Baxter, Baxter is vicariously liable for her negligence. As stated above, plaintiffs are not alleging that Dr. Pritchard is an actual agent of Baxter because clearly, pursuant to the Agreement, Dr. Pritchard is an independent contractor. In addition, plaintiffs have submitted no evidence that indicates that an employer/employee relationship existed. Instead, plaintiffs assert that Dr. Pritchard is an "apparent" or "ostensible" agent of Baxter.

Apparent authority, or ostensible authority, as it is also called, is that which, though not actually granted, the principal knowingly permits the agent to exercise, or which he holds him out as possessing. In effect, therefore, an agent's apparent authority is, as to third persons dealing in good faith with the subject of his agency and entitled to rely upon such appearance, his real authority, and it may apply to a single transaction, or to a series of transactions.

3 Am.Jur.2d *Agency* § 78 at 583–584 (1986) (footnotes omitted).

■ Arkansas defines apparent authority as:

Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess....

*Columbia Mut. Cas. Ins. Co. v. Ingraham,* 320 Ark. 408, 411, 896 S.W.2d 903, 905 (1995) (*quoting Henry v. Gaines–Derden Enters., Inc.,* 314 Ark. 542, 552, 863 S.W.2d 828, 834 (1993)).

"Whether or not an agent is acting within the scope of actual or apparent authority is a question of fact for the jury to determine." *Henry*, 314 Ark. at 551, 863 S.W.2d at 833 (citations omitted). Thus, the issue of whether Baxter held Dr. Pritchard out to be its agent is a question for the jury to decide. The obstacle plaintiffs must overcome, however, before that question can go to the jury, is the issue of whether a physician can, as a matter of law, be an agent in the sense required by the doctrine of *respondeat superior.*

■ The case law in Arkansas as to when or whether an institution providing medical services to the public through medical doctors can be liable for the acts of negligence of such doctors is convoluted and uncertain, to say the least.

This issue was first decided by the Arkansas Supreme Court in *Arkansas Midland R.R. Co. v. Pearson*, 98 Ark. 399, 135 S.W. 917 (1911). In *Pearson*, a railroad company maintained a hospital department and hired physicians to work in the hospital to treat its employees. An employee died while in the care of the hospital department's physicians and his family brought suit against the railroad company for the negligence of the physicians. The court recognized that the issue of whether a physician could be regarded as an agent or servant had been decided differently by the courts of other jurisdictions, but it held:

> [a] physician cannot be regarded as an agent or servant in the usual sense of the term, since he is not and necessarily cannot be directed in the diagnosing of diseases and injuries and prescribing treatment therefor, his office being to exercise his best skill and judgment in such matters, without control from those by whom he is called or his fees are paid. It is generally held that hospitals conducted for charity are not responsible for the negligence or malpractice of their physicians, and that persons and hospitals who treat patients for hire with the expectation and hope of securing therefrom gain and profit are liable for such negligence and malpractice on their part.

98 Ark. at 410, 135 S.W. 917. The court determined that the railroad company's hospital was not performing its services for gain or profit. *Id.* The court stated that the railroad company was acting "gratuitously" in providing its employees with hospital accommodations and competent physicians to operate it. *Id.*, at 411, 135 S.W. 917. Therefore, the court held that the hospital could not be found liable for the malpractice of the physicians it employed. *Id.*, at 412, 135 S.W. 917. It is not at all clear from the opinion whether the basis of that holding is that the services were being provided gratuitously (charitable immunity), or because doctors cannot be considered agents subject to direction and control in carrying out their duties. The opinion seems to place some emphasis on each of these factors.

In *Runyan v. Goodrum*, 147 Ark. 481, 228 S.W. 397 (1921), a patient who was overexposed to radiation and seriously injured, brought a cause of action against the physicians who owned the hospital as well as the physician and x-ray specialist who administered the radiation therapy. In holding that the supervising physicians were not vicariously liable for the negligence of the x-ray specialist, the court stated:

> the x-ray specialist ... like the physician and surgeon, unless he expressly contracts to produce certain results, has the right to, and must at all times, act according to his independent judgment and discretion in the exercise of his skill and learning in the treatment of human diseases. The very nature of his profession and the character of his contract of employment involves this right.

147 Ark. at 490, 228 S.W. 397.

Thus, it appears that at least at that stage of the development of the law on this issue, the Arkansas Supreme Court had held that doctors, by the very nature of their work, could not be subject to the kind of direction and control necessary to make them agents for purposes of *respondeat superior.*

In *Chicago, Rock Island & Pac. Ry. Co. v. Britt*, 189 Ark. 571, 74 S.W.2d 398 (1934), the facts were similar to the facts of *Pearson*, but the holding was opposite. In *Britt*, the railroad company contracted with a group of physicians to provide surgical and medical attention to its employees. Due to the negligence of one of the physicians, an employee

was seriously injured. The court found that the railroad company *could* be held vicariously liable for the negligence of the physicians it employed. The court reviewed its earlier decision in *Pearson* and stated that where a company "*gratuitously* assumed to collect and preserve a fund therefrom to provide hospital accommodations and medical attention without gain and profit, it would not be liable." 189 Ark. at 580, 74 S.W.2d 398 (emphasis added). The court determined that there was no evidence in that case that the railroad company had gratuitously provided its employees with hospital accommodations. The court stated that the railroad company had contracted with its employees to provide such medical services and had hired the physicians to provide the same. "Any person or corporation who makes a contract of employment with another agreeing to pay the other for his services and the other person accepts the employment and agrees to do the work, if he is negligent in doing the work, the employer is liable." 189 Ark. at 583, 74 S.W.2d 398. The court believed that the issue was "simply a question of master and servant." *Id.*

The court found that the railroad company had the right to control the physicians' actions. *Id.*, at 580, 74 S.W.2d 398. Thus, the court in *Britt* based its decision on a theory of *respondeat superior*, holding that, because the railroad company employed the physicians and had control over their work, the company was liable for the physicians' negligence. Because the railroad company was not providing the hospital accommodations gratuitously, **and** because the railroad had the right to control the work of the physician, the rule in *Pearson* did not apply.

Thus, prior to the court's decision in *Medi–Stat, Inc. v. Kusturin*, 303 Ark. 45, 792 S.W.2d 869 (1990), which is discussed below, the law in Arkansas seems to have been that a hospital or other organization providing medical services through doctors could not be liable for the negligence of such doctors absent a showing that the organization had the *rather unusual right to control how the* doctors did their job.

Thus, although the court had tended to mix apples and oranges by mingling and mixing the doctrines of immunity of eleemosynary organizations and *respondeat superior*, it appears that the law at this point was that an organization supplying medical services through independent contractor doctors could not be liable for the negligence of such doctors unless the organization had the right to control the manner of treatment to the extent that the independent contractor status was destroyed. That was true whether the organization conducted its business for-profit or not-for-profit. Of course, if the organization was charitable, it could not be liable even if it controlled the activities of its doctors to the extent that they became its agents.

That made a great deal of sense and it fitted into the traditional notions of *respondeat superior* and charitable immunity. Then came *Medi–Stat.* In *Medi–Stat,* the court concluded that a for-profit corporation can be held liable for the medical negligence of its physician employees, *Id.*, 303 Ark. at 49, 792 S.W.2d at 872, but it is difficult to glean from the case on what basis that holding rests. In reaching its conclusion, the court did not discuss to any extent the issue of control, but, instead it listed a number of factors which it said supported its holding. We believe that the factors bear primarily on the issue of whether Medi–Stat represented to the plaintiff that the physicians on duty were its agents. The factors do not bear on the issue of whether Medi–Stat had control over the acts of the physicians.[5] Specifically, the court stated:

all of Cowan's appointments were scheduled with Medi–Stat and not with a particular physician. ... [The] records all bear the notation Medi–Stat, Inc. and do not contain any name other than Medi–Stat. None of the records contain any sort of disclaimer or other indication that Medi–Stat is not the medical care provider or that its physicians are not employees of Medi–Stat. All of the billing for the medical services was done by Medi–Stat on Medi–Stat stationery that directed payment of the bill to Medi–Stat. In sum, the

---

5. The decision was a split, 4–3, decision. Justice Glaze discusses this issue in his dissent and correctly summarizes the state of the law at that time, and how the majority was straying from course.

treatment took place in a Medi–Stat clinic, the clinic chose the physicians, and the clinic billed on its stationary for the physicians' charges.

*Id.*, 303 Ark. at 49, 792 S.W.2d at 872.

Therefore, it appears that *Medi–Stat* extended the holding of *Britt* to include situations where a for-profit corporation held out to its customers that the physicians on duty were its agents. We use the term "appears" because, although the factors bear on the issue of apparent authority, the court did not state that it was basing its decision on that theory or even give any hint that it was.

Plaintiffs rely heavily on the court's decision in *Medi–Stat* in opposing summary judgment in this case. However, we do not believe that *Medi–Stat* is controlling precedent because Medi–Stat was a for-profit corporation and Baxter is a not-for-profit corporation, a factor that seems to take on a great deal of importance with the Arkansas Supreme Court in cases of this nature. This court believes that *Medi–Stat* is an aberration in the law, and stands for nothing more than a finding that a for-profit corporation providing medical services to the public may be liable for the negligence of its doctors under the facts of that case.

The court's final opinion on this subject makes the same distinction. In *Thomas v. Sessions*, 307 Ark. 203, 818 S.W.2d 940 (1991), the court specifically declined to extend the principle of *Medi–Stat* to charitable corporations.

The facts of *Thomas* are analogous to the facts in the present case. In *Thomas*, an incorporated group of physicians contracted with Jefferson Regional Medical Center ("Jefferson") to provide emergency room services. The agreement contained a specific clause stating that the doctors were not agents or employees of Jefferson. *Id.*, 307 Ark. at 211, 818 S.W.2d at 944. The court held that the physicians could not be held liable under the doctrine of *respondeat superior* for the negligent acts of the emergency room physicians.

Plaintiffs argue that the court in *Thomas* did not address the issue of apparent authority and thus, *Thomas* is not applicable to the present facts. We disagree. The court stated "a business corporation may be liable for the acts of a physician under the doctrine of *respondeat superior*, but that principle has not been extended to charitable corporations." [6] *Id.*, 307 Ark. at 211, 818 S.W.2d at 944 (*italics added*). *Respondeat superior* is a doctrine that holds a principal liable for the wrongful acts of its agent—acting with actual or apparent authority. The court specifically declined to extend the doctrine of *respondeat superior* to a hospital/physician relationship where the hospital is a charitable corporation. We believe that the court's decision in *Thomas* is controlling on the facts in this case.

Plaintiffs cite several cases in their brief that stand for the proposition that a charitable hospital may be held vicariously liable for the negligence of a physician who is the agent or employee of the hospital. We have read those cases and additional cases and we agree that courts in other jurisdictions have applied the apparent authority theory to these situations and have held that the charitable hospitals can be liable if they represent to patients that their physicians are hospital employees (if the patients justifiably rely on the representations). However, although it may not make a great deal of sense conceptually, the state of the law in Arkansas seems to be that, although a physician may be an agent or employee of a business corporation, a doctor cannot be the agent or employee of a charitable organization. Thus, we conclude, under Arkansas law, Baxter cannot be held vicariously liable for Dr. Pritchard's acts.

### III. CONCLUSION

Based on the above analysis, this court believes that no genuine issues of material fact exist as to plaintiffs' claims against separate defendant St. Paul Fire and Marine Insurance Company on their claim under EMTALA. Therefore, its motion for sum-

---

**6.** The court went on to say, in addition, that "a number of factors existed in *Medi–Stat* which are not present here." *Id.*, 307 Ark. at 211, 818 S.W.2d at 944. While plaintiffs have attempted

to analogize their facts with the facts of *Medi–Stat*, we think its clear that the present facts are more like the facts in *Thomas*.

mary judgment on both of plaintiffs' claims for relief will be granted by a separate order entered concurrently herewith.