## BAXTER v. SNOW.

No. 5011. Decided July 31, 1931. (2 Pac. [2d] 257.)

*Young & Boyle,* of Salt Lake City, for appellant.

*Herbert B. Maw,* of Salt Lake City, for respondent.

STRAUP, J.

The plaintiff brought this action against the defendant, a physician and surgeon at Salt Lake City, to recover damages alleged to have been sustained by him through the negligence of the defendant in removing wax from and treating the left ear of the plaintiff. That the defendant was a licensed physician and surgeon of long practice and experience and in the treatment of diseases and disorders of the eye, ear, nose, and throat had special training with the best recognized specialists of this country, Vienna, Berlin, and London, and for many years at Salt Lake City specialized in such treatments and was a physician and surgeon of high standing in his profession, were clearly shown and not questioned.

In the complaint it is alleged that on December 15, 1924, "the plaintiff went to the defendant ·for the purpose of having wax cleared out of his left ear and for no other purpose," and instructed the defendant to remove the wax and nothing more, but that the defendant, "in addition to taking wax from the plaintiff's ear, placed instruments into the said left ear of the plaintiff and also through the nose and into the left ear of the plaintiff, and did carelessly, negligently and wantonly treat said plaintiff's ear with said instruments to the extent that he did so injure plaintiff's left ear with said instrument that he did permanently deprive the plaintiff of his hearing in said left ear"; that when he went to the defendant, the plaintiff normally could hear through the left ear but "while the instruments of the defendant were in the plaintiff's ear and nose he was deprived of hearing in his left ear through the carelessness, negligence and wantonness of the defendant so that he has been continuously deaf in said ear ever since."

A special demurrer was interposed to the complaint on the ground of uncertainty and indefiniteness as to the alleged acts of negligence and wantonness and as to the nature and character of the injury claimed to have been inflicted, and the manner in which it was inflicted. On the same ground, a motion was also interposed to require the plaintiff to make the complaint more specific. Both the demurrer and the motion were overruled. The defendant answered denying the alleged negligence, injury, and damage, and all the allegations of the complaint in such respect and that the plaintiff's hearing when he first visited him was in a healthy or normal condition, and to the contrary alleged that it was in an impaired and in a chronic condition; that the plaintiff first visited him, not in December, 1924, as alleged in the complaint, but on January 12, 1925, and that the defendant periodically treated him for several months thereafter, and that in doing so he followed and gave him the usual and approved treatment followed by practicing otologists of good standing.

The case was tried to the court and a jury. At the conclusion of plaintiff's evidence, the defendant interposed a motion for nonsuit, which was overruled. He thereupon adduced evidence in denial of the allegations of the complaint and in support of his answer, and at the conclusion thereof and when both parties rested, interposed a motion for a directed verdict in his favor, which also was overruled. The case was submitted to the jury, who rendered a verdict in favor of the plaintiff in the sum of $2,000.

The defendant thereafter filed a motion for a new trial on grounds, among others, of insufficiency of the evidence to support the verdict, that the verdict was against law, errors in law occurring at the trial, and of newly discovered evidence which was supported by affidavits of persons well acquainted with the plaintiff to the effect that he had defective and impaired hearing long before he was treated by the defendant. Such motion also was overruled. From the judgment entered on the verdict, the defendant has prosecuted this appeal.

The assignments of error present for review the various rulings referred to, and also exceptions taken to portions of the charge to the jury, and of the court's refusal to charge as requested by the defendant. To a great extent, such rulings may be considered together.

The plaintiff was 57 or 58 years of age. When he first visited the defendant he was and for a year or more prior thereto had been, in the employ of a street car company at Salt Lake City as a helper and laborer in and about the car barns of the company sacking sand and delivering supplies from the storeroom to the shop, and was a sort of "roust-about." As he testified, he was not certain when he first visited the defendant, whether it was in 1924 or in 1925, nor was he certain as to the number of times he visited the defendant and was treated by him, he testified probably 15 or 25 times until several months prior to October, 1925, when he moved to San Francisco. In telephoning, he, as he testified, discovered he did not hear well through the left ear, but it had not pained him. He visited the defendant's office, and, as he testified, asked him to look in his left ear to see if he had wax in it. On request of the defendant, he took the doctor's chair. The doctor inserted "a little funnel-shaped thing" in his ear and looked through it; that he pushed it in a little way, but it did not hurt him. The doctor then took two little pieces of wax about the size of a wheat kernel from his ear. He thought he took that out with a little instrument two or three inches long, or by syringing the ear, he was not sure which. However, neither hurt nor pained him. The doctor did not tell him that the ear was diseased. Then the doctor examined his throat and nose and inserted an instrument six or seven inches long up his nose. That, he testified, pained him some, but he did not say anything about it to the doctor. The pain ceased when the doctor removed the instrument, which was shown to be a catheter. After the catheter was removed, the plaintiff stated to the doctor, "I cannot hear out of that ear, you have made me deaf." The doctor said, "Well, now, it will take two or three treatments or applications to fix

you up." The plaintiff testified he noticed a change in his hearing through the left ear, and after that could not hear through it. The doctor treated him on that occasion 15 or 20 minutes. The doctor put some cotton dipped in "black medicine" in his ear, told him to leave it in through the night, and return in a day or two. The plaintiff paid him $2 on that visit. After that he returned to the office for further treatment. On the second treatment, he thought the doctor merely syringed his ear and put in more cotton dipped in medicine, and did not use any instrument in his nose on that occasion. When asked if the plaintiff should pay him at each treatment, the doctor told him he could wait until he got through treating him. The plaintiff testified that after that he went. back for further treatment, he thought 15, 20, or 25 times, covering a period of 8 or 10 months, and on each occasion was treated by the doctor. He described the treatments as syringing his ear and using "some kind of air pressure to put air through my ear and I thought he put the same thing up my nose," and used "a little hand bulb" and "a long pipe" which "went up through my nose, and seemed to be elastic," and that he had "an instrument on his air machine to see if there was air escaping through my ear and a long rubber tube ending in a hard rubber tip which rested inside my nostril and the doctor used that bag for the purpose of forcing air up my nostril," and used such instrument on two occasions, but he experienced no pain while the doctor was using it, nor any nausea, and did not blame the use of that instrument for the loss of his hearing. He further testified that the treatments were pretty much alike, that he could not tell one from the other.

He further testified that at the last treatment the doctor told him he had done all he could for him and that if he desired he was at liberty to see any other specialist. After that, the plaintiff testified, he received a bill from the doctor for $16. After receiving it he went to the doctor's office and said "Doctor, do you want me to pay for this statement," and the doctor replied, "Yes, I do." Plaintiff said, "Do you really want me to pay you this sixteen dollars" and he

said, "Yes, I do, I want my money"; that the plaintiff then said, "I thought I would come to see you just to see if you wanted me to pay you for making me deaf," and the doctor said, "I did not make you deaf." The plaintiff told him he had, and the doctor said he could not prove it, and the plaintiff said "well, maybe I cannot, but if you are that kind of a man and want that sixteen dollars for leaving me in this condition I am going to try it," and the doctor said if he could prove it he could get "a lot of damages," and that the plaintiff stated "I am going to sue you for damages."

The plaintiff further testified that thereupon the defendant called in another ear specialist in the building and asked the plaintiff if he had any objections to the specialist looking in his ear, and the plaintiff said that he had not; that the other specialist then examined his ear and after doing so he told the plaintiff that the defendant in the way he treated his ear could not have done and did not do what the plaintiff claimed he had done; that the defendant then stated to the plaintiff that if he wanted to come back he would continue to treat him without charge, to which the plaintiff replied he would suit himself, but never went back. The plaintiff further testified that he thereafter consulted three other specialists, one at Salt Lake City and two at San Francisco, "but I could not get them to say anything. I went to them just for examination."

He further testified that when the doctor removed the wax he did not experience any pain and felt no pain during the syringing of the ear, that it made him a little dizzy, but there was no pain and that the dizziness lasted two or three minutes and then passed away. He further testified that he lost his hearing before he got out of the chair on the first visit; that he did not claim syringing the ear, or the use of the bulb, or the cotton or the medicine put in the ear, or any of the subsequent treatments caused the loss of his hearing, but thought it was occasioned on the first visit by the insertion of the instrument in the nose, and that he

felt a difference in his hearing while the doctor was treating him on that occasion. He was asked and he answered:

"Q. Can you tell what instrument he was using when that feeling was experienced? A. I would not say which one it was.

"Q. Do you not know? A. No, I do not know, Dr. Snow said very little when he was operating; the only time the doctor hurt me was when the crooked instrument was put up my nose, and I thought, if it was anything it was when the doctor put that instrument up through my nose, I do not know.

"Q. Did you notice a difference in your hearing come over you while the instrument was up your nose? A. I could not tell because there was nothing said—I do not think there was a thing said.

"Q. What incident or event during the first treatment happened which made you believe that Dr. Snow destroyed your hearing? A. Well, I do not know whether he spoke to me or not, but there was something that drawed my attention to my hearing and then I mentioned it to him.

"Q. Can you tell us what was happening—what Dr. Snow was doing as you noticed a change in your hearing? A. No, I cannot tell you the particular part of the treatment when it happened, I cannot tell you that.

"Q. If you know any further details with respect to the time and manner in which your hearing was lost will you kindly give that detail—I do not mean just to tell what someone may have told you, but what you yourself may have felt and experienced? A. I could not give that to you. * * *

"Q. Now, before Dr. Snow inserted this long crooked instrument into your left nostril, did he examine the nostril and your throat? A. I think he did. I believe he did examine it first.

"Q. Did he push it (the catheter) in hard? A. Not awful hard, I did not notice he pressed it in very hard but it hurt me at that time. As he was inserting the catheter it tickled a little at first. When it got up in my head it kind of hurt me. That is the pain I had at that time.

"Q. When Dr. Snow withdrew the catheter from the left nostril did that pain cease? A. Yes, sir.

"Q. It was not a continuing pain? A. No.

"Q. And I think you said while the catheter was up your nose he did not force it hard? A. I did not notice that he did. As the catheter was in position in the nose I did not hear any loud pop or explosion-like sound or experience any dizziness or nausea. It did not make me sick. I did not notice anything wrong.

"You felt perfectly normal except for the sensitiveness of the tissues in the inner part of the head? A. Yes, that is right.

"Q. You do not pretend to know whether the catheter came into contact with the drumhead of the ear? A. No, I do not know anything about that. * * *

"Q. Is it your position you lost your hearing while that instrument was up your nostril? A. That is the only one that hurt me and I did not know whether that might be the one or not.

"Q. And the hurt to which you refer was a hurt which stopped when he withdrew the catheter? A. Yes, it stopped.

"Q. Did you experience any sort of pain while Dr. Snow was treating you on any other occasion? A. No, sir, only a little dizziness while he was syringing my ear.

"Q. You did not mention to Dr. Snow the pain you felt while the catheter was up your nostril, did you? A. I do not think I did. I do not remember if I did or not, I do not think I did.

"Q. And you wish to be understood now as saying you do not recall any instant of time during that first treatment when your hearing in the left ear suddenly stopped? A. No, sir, I cannot tell you the exact time that this damage was done—I cannot tell you the exact time. * * *

"Q. Do you recall how many times Dr. Snow used the catheter in treating you? A. No, I think he only used that once."

He further testified that the specialist, whom the defendant called in, made a careful examination of his ear at the time, and told him that the defendant could not have affected his ear the way he treated him, and that the defendant did not do what the plaintiff claimed he had done. In this connection, he was asked and answered:

"Q. You do recall his saying that he did not think Dr. Snow could have done what you said he had done? A. Yes.

"Q. You did not hear Dr. Snow admit he had done what you accused him of having done? A. I did not hear him admit it, no.

"Q. And you never have? A. No, he never has, and at no time admitted that he punctured the ear drum, or that he had destroyed or damaged his hearing, or that anything had happened in the case which injuriously affected his hearing."

The plaintiff's wife testified that, before the plaintiff visited the defendant, the plaintiff's hearing was "all right, just the same as ever," and that it was not necessary for her to speak above a normal tone to have him hear what she said, but when he returned from his first visit at the defendant's

office she noticed a difference in this hearing and that he didn't hear so well, that she had to speak louder to him, and that he complained of his hearing; that after the plaintiff had been treated by the defendant for four or five months, she on one occasion was at the defendant's office and asked the defendant "if Mr. Baxter was going to get his hearing back," and he said "I am in hopes I will get him to where he was when he first came here," and she said, "That is good"; that the defendant did not say anything else and did not explain what he meant, and that the plaintiff continued to take treatments therafter, maybe a month or so, when she and the plaintiff moved from Salt Lake City to San Francisco.

A brother-in-law of the plaintiff testified that he knew the plaintiff when he formerly lived in the northern part of the state where the witness lived, and that after the plaintiff moved to Salt Lake City the witness during the years 1924 and 1925 occasionally visited at the plaintiff's home; that the plaintiff could understand him in ordinary conversation, but later he noticed a change in his hearing, but could not fix the time exactly, except it was during the time the plaintiff was working for the street car company, and then he had to speak quite loudly in conversations had with him, but he did not know whether his defect in hearing was in the right or in the left ear.

Another witness who worked with the plaintiff at the car barns testified that the plaintiff's hearing was good when he first went to work at the car barns, he could not say exactly just when that was, and that he could hear what was said in ordinary conversation; that thereafter he noticed a change in his hearing, in the summer of 1924, but would not be sure of the year, and that the plaintiff was off a few days and came back and couldn't hear on the one side when he returned to work.

Another witness testified that he had known the plaintiff since 1924 or 1925; that in 1924 he had no difficulty in holding conversations with him, but he afterwards saw a change

in his hearing, but could not fix the time when the change came, but thought it was about "after the time he was operated on, likely."

The foregoing in substance is all of the evidence on behalf of the plaintiff bearing on the questions under consideration. No evidence was given to support the allegations of the complaint that the plaintiff had instructed the defendant to merely remove the wax from his ear and to do no more. Nor was there any evidence given to show that the treatment administered or adopted by the defendant was improper, or that the defendant employed a treatment or method not usually or ordinarily employed by skilled and competent otologists, or that he in the treatment did anything which was not usually or ordinarily done by skilled and competent otologists in the treatment. No otologist or physician or surgeon was called by the plaintiff, nor was there any evidence adduced by him to show that any part of the ear had been injured or damaged, except as testified to by the plaintiff that he lost hearing in the left ear on his first visit while in the doctor's chair and being treated by the defendant.

The defendant testified in detail as to the condition of the plaintiff's ear, a thickened, pushed in and restricted drumhead with congestion and inflammation and an obstructed passage of the eustachian tube, the treatment given the plaintiff, and the instruments and appliances used by him. He testified that the plaintiff came to his office on January 12, 1925. After the first treatment, he asked the plaintiff to return in a day or two. He did not return until January 22d when he further treated him, and again treated him on six different occasions in February, giving the dates of each, and that the last treatment was on March 7th. The dates on which the plaintiff was treated were shown by the defendant's books kept by his assistant and corroborated by her. After March 7th, the plaintiff did not again visit the defendant until July 13th when he called and complained of his right ear, and stated that the hearing in that ear was worse than in the left. When the doctor got his mirror and

speculum and was about to examine the right ear, the plaintiff stated that when he was treated in January he thought the doctor had injured his left ear, to which the doctor replied that if he thought that, he did not see why he wanted him to treat his right ear. The plaintiff expressing a willingness that another specialist might examine his left ear, the defendant called in a specialist in the same building who examined the ear and who testified on behalf of the defendant.

On the first visit, the plaintiff complained of inability to hear well through the left ear. He did not state that he had wax in the ear, or as to the cause of his disability. His hearing was first tested by the defendant with the result that the plaintiff could hear a loud conversation no farther than four or five feet away. He examined the ear with a speculum and mirror and found wax in the ear and removed it with a syringe, and then examined it further and found the drumhead congested and somewhat inflamed and in a pushed in and restricted condition. On further cleansing the ear, he inserted a cotton pledget dipped in ichthyol, which is of a dark brown color and is what the plaintiff referred to in his testimony as the "black medicine" put in his ear. As explained, ichthyol is a somewhat penetrating stringent, and is used to reduce inflammation. As testified to by the defendant, ichthyol does not cause the patient pain, but in some cases there might be a little drawing condition present and cause some inconvenience, but of no harmful effect. He directed the plaintiff to leave the cotton in the ear about 24 hours, and then return in a day or two. That was all the treatment the doctor testified he gave the plaintiff on that, the first visit, and on that occasion.he did not use the catheter or otherwise attempt to force air in or through the eustachian tube, and that the plaintiff did not on that visit nor on any of the visits complain of any damage or injury to his hearing through the treatment, nor complain of deafness or loss of hearing, until in July, when he came to the defendant to be treated for his right ear, and then stated he thought the defendant had injured his left ear in January.

On the second visit, the defendant explained to the plaintiff that he found the drumhead pushed in and restricted in the left ear, which he told him was due to an obstruction of the eustachian tube and had to be opened. He attempted to do that with what is called a Politzer bag but was unable to get air through and in the middle ear by such means, and thereupon used a catheter for such purpose and for diagnosis. He fully explained the three parts of the ear, the outer, middle, and inner ear, the function of each, as well as the position and function of the eustachian tube and the relation and position of each, and brought with him on the witness stand a speculum, mirrors, catheter, Politzer bag, Siegel otoscope, and other instruments, and explained the use of them, and, in the presence of the jury demonstrated on himself the manner in which he used the instruments in the treatment of the plaintiff's ear. He testified that in the use of them it was not possible to bring them in contact with the inner ear, or that the middle or outer ear or drumhead could be harmed or affected in the use of them, that the catheter as used could not extend more than one-sixteenth of an inch in the eustachian tube, and that the drumhead was not and could not have been punctured or injured by any of the instruments used by him; that it required from 45 to 60 pounds pressure to puncture a normal drumhead, and that it was not possible through the use of the Politzer bag to apply a pressure to exceed 5 or 6 pounds; that as the catheter did not fit tightly in the eustachian tube only about two pounds pressure entered the tube; that a drumhead in normal condition would successfully withstand an equal amount of water pressure (from 35 to 60 pounds), and that the water pressure from such a syringe as used by him would not exceed 10 pounds, probably not more than 2 or 3 pounds; that he had never known a drumhead to be broken by water pressure during a process of syringing, and that on examining the ear in the various treatments given the plaintiff, as well as in July when the plaintiff last called, he was positive the drumhead was not penetrated, punctured, or broken or

injured in any particular. And to that effect was also the testimony of the specialist who was called in and examined plaintiff's ear in July.

The defendant further testified that all of the appliances used and the treatments given by him were standard and were used and given by skilled otologists in the treatment of such conditions and cases. He further testified that on bursting or puncturing the drumhead with an instrument the patient would experience a loud puffing or popping sound, have severe pain, and a feeling of dizziness and nausea.

In all this, the defendant was corroborated by three otologists of long experience and practice in Salt Lake City, and who testified that by the instruments used and treatment given the plaintiff he could not have been injured, or his hearing injuriously affected or destroyed, as claimed by him.

The defendant further testified that when he treated the plaintiff in March, he could hear better through the left ear that he could when the defendant started to treat him. The otologist of the street car company, in whose employ the plaintiff was, testified that on July 2, 1925, a week or ten days prior to the time the plaintiff last called on the defendant, he examined the plaintiff and found that his hearing in both ears and his eye sight were so defective and impaired as to disqualify him "for the position of helper," that the plaintiff was not totally deaf in either ear, but his hearing was greatly impaired in both, in the one about as much as in the other, and that the plaintiff "heard the shouting of the human voice better with the left ear than with the right."

The defendant further testified that the plaintiff's wife at no time visited him at his office, and that he there had no conversation with her, in which he was corroborated by his assistant, and that he at no time or place had any conversation with her. He also testified that he had not offered to further treat the plaintiff free of charge, as testified to by the plaintiff, and in that he was corroborated by the specialist who examined the plaintiff on that occasion. He also testified that he did not state to the plaintiff, as testified to

by him, that he had done all that he could for him, or that he was at liberty to go and see any other specialist, or that he had given him up, or that he could not do anything more for him, or that he stated to the plaintiff if he could prove he made him deaf·he could get "a lot" or any damages, or that any such conversation was had between them.

In submitting the case to the jury, the court, among other things, charged that the defendant "was not an insurer of good results and that he could be held to respond in damages only in the event it was shown he failed to exercise" that degree of care and skill ordinarily exercised by otologists, etc.; that the plaintiff had the burden of proving that the defendant failed to exercise such care and was guilty of negligence, and that he sustained injury as the result thereof; that the undertaking of an otologist was not that his treatment would be successful, or even that it would be beneficial; that he was required to exercise an honest judgment, but that, in the absence of negligence, he was not liable even though he erred in judgment; and that a patient who placed himself in the care of an otologist conferred on him implied authority within the scope of the employment to perform all acts and conditions reasonably necessary to the treatment of the case. The court further charged that:

"11. The mere fact that a Eustachian Catheter, or other instrument in common use among otologists for use in treating a patient, does not in the absence of neglect impose upon a practitioner using it to treat the ailment of a patient, within the scope of his employment, the burden of answering in damages for such injury. Such instruments are indispensable to the practice of otology, and their use creates no presumption against the instruments or the practitioner using them. An otologist does not in law insure the safety of his patients, nor does the question of liability herein hinge upon the character of the agency employed, but upon the manner of its use, as to which the presumption of due care is in favor of the practitioner until overcome by evidence to the contrary."

"12. Any operation on any part of a person's body is considered by law as a technical battery unless it is authorized. If a physician operates in any manner on a person without the consent he is guilty of a battery and is liable for all injuries resulting therefrom, even though

great skill is used in the operation. If you find that the plaintiff instructed the defendant to remove wax from his ear, and that the defendant placed instruments into the ear or head of the plaintiff for any other purpose than the removal of wax, without first obtaining the actual or implied consent of the plaintiff, then the defendant is guilty of a technical battery and is liable to the plaintiff for all damages resulting therefrom."

"14. The burden of proof is on the plaintiff to prove negligence. This might be done either by direct testimony or by showing that the treatment itself plainly indicated that the physician was negligent. If you find that the plaintiff could hear through his left ear when he sat in defendant's chair on the occasion of his first treatment and that during the period he sat in the defendant's chair he was totally deprived of his hearing, in his left ear, you may use that fact as evidence of negligence on the part of the defendant, unless satisfactorily explained by the defendant."

We are of the opinion that the court erred in refusing to grant the nonsuit and to direct a verdict in defendant's favor. The gravamen of the action is negligence, that the defendant negligently and wantonly treated the plaintiff's ear with instruments, and permanently deprived him of hearing in that ear. To recover, the plaintiff was required affirmatively to show that the defendant in the treatment did not exercise such reasonable care, skill, and diligence as ordinarily is exercised by skilled otologists in the same vicinity in the treatment of such cases as was treated by the defendant, and that the want or failure of such skill or care caused the injury complained of. To show that, the plaintiff was required to show something more than mere conjecture, speculation, or suspicion.

As to the issue of negligence, there is no substantial conflict in the evidence. There is no conflict as to the extent the hearing in the plaintiff's left ear was affected when he first visited the defendant. That his hearing in that ear then was impaired is not disputed. Because of such condition, the plaintiff consulted the defendant. In considering the charged negligence alone from the testimony of the plaintiff, it is seen that he visited the defendant and asked him to look in his ear to see if he had

wax in it, that the defendant examined the ear, removed wax therefrom and treated the ear, the plaintiff describing somewhat in detail the treatment given him and the instruments used by the defendant. The plaintiff did not testify, as he alleged in his complaint, that he merely asked the defendant to see if he had wax in his ear and to remove it, and that he directed or instructed him to do no more. He did not testify that he even expressly directed the defendant to remove wax from the ear, if any was found therein. Of course, that the defendant should do so was clearly implied. That is not disputed. But the plaintiff urges that the defendant was not authorized to do more, either to make a diagnosis of the condition of the ear, or to give treatment of any condition found in the ear, and that while making a diagnosis or giving treatment on the first visit the defendant through negligence rendered the plaintiff totally deaf in the left ear. Had the plaintiff undertaken to direct the defendant as to the kind of diagnosis to be made or the manner of making it, or as to the treatment to be given or prescribed, it is likely that the defendant or any other respectable, competent, and skillful physician or surgeon under such circumstances would have declined to have anything to do with the case.

The case is not one where the physician or surgeon treated or operated on one without his consent, either express or implied. Where as here the plaintiff finding a disability in hearing through the left ear went to the defendant to ascertain the cause thereof and submitted himself to an examination to ascertain the cause, voluntarily submitted to the treatments given him by the defendant, and with full knowledge of just what the defendant did and was doing for him acquiesced in and consented to all the defendant did for him, clearly by implication authorized the defendant to diagnose the case to discover for himself the cause of plaintiff's disability, and to give such treatment or treatments as in the judgment of the defendant was proper and by him deemed reasonably necessary to relieve the disability. *King* v. *Carney,* 85 Okla. 62, 204 P. 270, 26

A. L. R. 1032; *Knowles* v. *Blue*, 209 Ala. 27, 95 So. 481; *State, Use of Janney* v. *Housekeeper & Gifford*, 70 Md. 162, 16 A. 382, 2 L. R. A. 587, 14 Am. St. Rep. 340.

Though the plaintiff may have believed his disability to hear was due to wax in his ear, yet that did not relieve the defendant from discovering the true cause of the defect called upon to remedy. *King* v. *Carney*, supra. The plaintiff testified that he was not sure whether the wax was removed by means of a little instrument two or three inches long or by syringing the ear, that he saw the wax after it was removed, and that the defendant on the same visit examined his nose and throat. He did not object to that, nor claim that the defendant in doing so did anything not within his employment, nor did he object to the examination which the defendant made of his ear to ascertain its condition, nor to the cotton dipped in "black medicine" and put in his ear. To all that he voluntarily consented and acquiesced therein. As he testified, the defendant also on that visit put a crooked instrument six or seven inches long in his nostril. What he thought that was done for he did not say. He certainly was not led to believe that the defendant examined his throat and nose and inserted the instrument in his nostril to remove wax from his ear. At least he did not so testify. From his testimony, it appears he understood that what was "put up his nose" was to examine or force air through it and the ear, and what the defendant did was to diagnose the condition of the ear and to treat it. He made no objection whatever to the insertion of the instrument, and voluntarily submitted and consented thereto. The insertion, as he testified, hurt him some, but he made no complaint of hurting him to the defendant, and when the instrument was withdrawn the pain ceased. He further testified he thereafter went to the defendant's office many times, he said 15 or 25, for further treatment, and voluntarily submitted to the treatments given him by the defendant.

Thus, on the testimony alone of the plaintiff, we think it is not shown that the defendant was not authorized to

diagnose or treat the case. Where one has voluntarily submitted himself to a physician or surgeon for diagnosis and treatment of an ailment it, in the absence of evidence to the contrary, will be presumed that what the doctor did was either expressly or by implication authorized to be done. We in passing may therefore say, for the reasons just stated, that paragraph 12 of the charge, that a physician who operates in any manner on a person without his consent is guilty of a battery and liable for all injuries resulting therefrom, etc., was erroneous and harmful because not supported by evidence rendering such a charge applicable.

It, however, is chiefly urged by the plaintiff that, though the defendant impliedly was authorized to diagnose and treat the case, he nevertheless so negligently and carelessly treated it as to destroy what hearing the plaintiff had in his left ear; and that, as has been seen, is the real gravamen of the action. As also is seen by the testimony of the plaintiff, the claimed negligence, if any there was, arose out of or was occasioned by the insertion of the "crooked instrument," the catheter, in the plaintiff's nostril on the first visit. He did not and does not now claim that anything else was done on that visit, or that anything was done at any subsequent visit, which, as he contended, destroyed his hearing in the left ear. No claim is made that the catheter was used in a forceful, violent or negligent manner. So far as the plaintiff's testimony goes on such subject, the defendant used the catheter in a careful manner. No attempt was made by the plaintiff or by any other witness to explain how or in what manner the plaintiff's hearing could have been or was destroyed by the insertion or use of the catheter. Nor was any attempt made to show, nor was there any claim made, that the catheter for the purpose for which it was used was an improper instrument to use, or that it was improper or unnecessary or injurious or likely to destroy the hearing by inserting such an instrument as was inserted in the nasal passage and passages connected therewith. Nor was there any attempt made to show what by the insertion of the catheter could have happened, or might

have happened, or probably did happen, or in what manner the hearing the plaintiff had in the left ear could have been destroyed. No act or thing done by the defendant is pointed to as constituting negligence, or as not having been done prudently or carefully. All that the plaintiff said, all that he could say was, and all that here is now said or claimed is, that the plaintiff had hearing in the left ear when he got in the doctor's chair, but when the catheter was inserted and removed he felt a change in his hearing, and thereafter could not hear through that ear, which, it is contended, prima facie and sufficiently shows the charged negligence of the defendant to call for an explanation and to cast the duty on him of going forward and showing whatever injury or impairment of hearing, if any, resulted through or in the course of the treatment was not caused through his fault or neglect. While the plaintiff apparently admits that the doctrine of res ipsa loquitur does not apply in cases of this character, as clearly it does not *(Ewing* v. *Goode* [C. C.] 78 F. 442; *Moore* v. *Smith,* 215 Ala. 592, 111 So. 918; *Carraway* v. *Graham,* 218 Ala. 453, 118 So. 807; *Runyan* v. *Goodrum,* 147 Ark. 481, 228 S. W. 397, 13 A. L. R. 1403; *McCoy* v. *Buck,* 87 Ind. App. 433, 157 N. E. 456, 160 N. E. 46; *McCoy* v. *Clegg,* 36 Wyo. 473, 257 P. 484; *Vale* v. *Noe,* 172 Wis. 421, 179 N. W. 572; *Miller* v. *Blackburn,* 170 Ky. 263, 185 S. W. 864; *Fox* v. *Mason,* 139 Va. 667, 124 S. E. 405), nevertheless in argument principles analogous to the doctrine are invoked, which, it is contended when considered in connection with what is claimed admissions by the defendant, sufficiently shows the charged negligence to sustain the rulings of the court below denying the motions for nonsuit and a direction of the verdict. We think the argument untenable. Though on the basis of the argument, and applying the principles invoked, it be assumed that the evidence was sufficient to cast a duty on the defendant to go forward and show that whatever loss or impairment of hearing, if any, resulted in the course of the treatment was not due to any fault or neglect of the defendant, yet, such duty was fully discharged by the defendant showing just what condi-

tion the plaintiff's ear was in when he first examined it, by showing just what he did in diagnosing and treating the case, what instruments were used by him, and the manner and purpose for which they were used, especially the manner and purpose for which the catheter was used, indisputably showing not only by his own testimony but that of three skilled otologists of long practice and experience that the instruments employed by the defendant were standard and suitable and generally used by skilled otologists in diagnosing and treating ailments of the character diagnosed and treated by the defendant, and that by the use of them, as indisputably shown they were used, the plaintiff's ear was not and could not have been injuriously affected nor his hearing destroyed or impaired, and that the treatment which the defendant gave the plaintiff was in accordance with approved methods used and adopted by skilled otologists. All this being undisputed, the jury were not at liberty to disregard it and render a verdict contrary thereto or based on mere surmise or conjecture.

In this connection, the further observation is pertinent. While in many cases where expert testimony is permitted and is given the conclusion or opinions expressed by the experts are not necessarily conclusive on the jury, and where on proven facts and circumstances of the case the jury may and are permitted to reach their own conclusion on an ultimate fact though such conclusion is adverse to the opinions expressed by the experts, illustrations of which need not here be noted, yet in many cases involving questions of professional skill with respect to which the layman has no knowledge and cannot accurately judge and which can be made evident only by those skilled in the profession, the jury is not given so wide a latitude. Such rule is quite generally applied in actions of malpractice against a physician or surgeon. Says Professor Wigmore in his work on Evidence, Vol. 4, § 2090 (2d Ed.) :

"It happens, however, that in one class of cases, viz., actions for malpractice against a physician or surgeon, the main issue of the defendant's use of suitable professional skill is generally a topic calling

for expert testimony only; and also that the plaintiff in such an action often prefers to rest his case on the mere facts of his sufferings, and to rely upon the jury's untutored sympathies, without attempting specifically to evidence the defendant's unskillfulness as the cause of those sufferings. Here the Courts have been obliged to insist on the dictate of simple logic, resulting from the principle above cited (of Sec. 555, ante), that expert testimony on the main fact in issue must somewhere appear in the plaintiff's whole evidence; and for lack of it the Court may rule, in its general power to pass upon the sufficiency of evidence (post, Sec. 2551), that there is not sufficient evidence to go to the jury."

In *Ewing* v. *Goode* (C. C.) 78 F. 442, 443, in a malpractice case, Circuit Judge Taft said:

"Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment; nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liablity for nearly all the 'ills that flesh is heir to.' * * * In many cases, expert evidence, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts, and accept or reject the statements of experts; but such cases are where the subject of discussion is on the border line between the domain of general and expert knowledge, as, for instance, where the value of land is involved, or where the value of professional services is in dispute. There the mode of reaching conclusions from the facts when stated is not so different from the inferences of common knowledge that expert testimony can be anything more than a mere guide. But when a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus

shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury. When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither."

In the case of *Perkins* v. *Trueblood,* 180 Cal. 437, 181 P. 642, 644, the court, quoting from the case of *McGraw* v. *Kerr,* 23 Colo. App. 163, 128 P. 870, 873, held that:

"Negligence on the part of a physician consists in his doing something which he should not have done. * * * What is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts and can be established only by their testimony."

There are many cases to the same effect. Some of them heretofore cited in support of the rule that the doctrine of res ipsa loquitur does not apply in a case of this kind, and in addition, among others, the cases of *Adolay* v. *Miller,* 60 Ind. App. 656, 111 N. E. 313; *Snearly* v. *McCarthy,* 180 Iowa, 81, 161 N. W. 108; *Rainey* v. *Smith,* 109 Kan. 692, 201 P. 1106; *Sawyer* v. *Berthold,* 116 Minn. 441, 134 N. W. 120; *Robbins* v. *Nathan,* 189 App. Div. 827, 179 N. Y. S. 281; *Wright* v. *Conway,* 34 Wyo. 1, 241 P. 369, 242 P. 1107; *Loudon* v. *Scott,* 58 Mont. 645, 194 P. 488, 12 A. L. R. 1487; *Sheldon* v. *Wright,* 80 Vt. 298, 67 A. 807; *Nixon* v. *Pfahler,* 279 Pa. 377, 124 A. 130; *Wurdemann* v. *Barnes,* 92 Wis. 206, 66 N. W. 111.

As already shown, the plaintiff did not adduce any such character of evidence. He contented himself merely on testifying that he had hearing in the left ear when he on the first visit got in the doctor's chair, and when he left it he noticed a change in his hearing and was, as he testified, thereafter deprived of hearing through that ear. We do not say that the rule, as to the necessity of expert testimony

as stated in the cases referred to, applies in all malpractice actions. A treatment may so plainly indicate that the physician or surgeon was negligent, or that an act done or failed to be done so obviously did not involve skill, as not to require any opinion of an expert as to the performance or' non-performance of the act. That is illustrated by what is known as the sponge or gauze cases *(Davis* v. *Kerr,* 239 Pa. 351, 86 A. 1007, 46 L. R. A. (N. S.) 611; *Baer* v. *Chowning,* 135 Minn. 453, 161 N. W. 144), where in an abdominal operation a sponge or gauze or other material was left enclosed in the wound after the performance of the operation; in the use of a dangerous agency such as an X-ray machine, where by long exposure the skin of the patient was severely burned *(Sauers* v. *Smits,* 49 Wash. 557, 95 P. 1097, 17 L.R.A. (N.S.) 1242; *Runyan* v. *Goodrum,* 147 Ark. 481, 228 S. W. 397, 13 A. L. R. 1403) ; and by cases such as the case of *Moratzky* v. *Wirth,* 67 Minn. 46, 69 N. W. 480, where a physician in treating a woman for a miscarriage neglected to remove remnants of the placenta. For obvious reasons, the case in hand does not come within such class or kind of cases.

The statement of the defendant as testified to by the plaintiff, that the defendant stated to him that "this is the first time I have ever had anything like this happen," and the testimony of the plaintiff's wife that when she asked the defendant "if Mr. Baxter was going to get his hearing back," the defendant replied, "I am in hopes I will get him to where he was when he first came here," statements characterized by the plaintiff as admissions are so vague and uncertain as not to possess much of any probative value. They certainly are wholly insufficient to show any admission of the charged negligence. ·

We also are of the opinion that error was committed in what was charged in the last sentence of paragraph 14 of the charge, because the charge in such particular in effect permitted or was calculated to permit the jury to apply the doctrine of res ipsa loquitur, which, as has been seen, was not applicable to the case. The charge in such particular further was objectionable because it sin-

gled out and called attention to particular testimony on a material issue to the exclusion of other testimony of equal importance, and, by so doing, tended to induce the jury to give undue weight to what was so directly called to their attention to the exclusion of other testimony of equal or greater weight or importance.

Thus, for the reasons stated, we are of the opinion that the judgment of the court below should be reversed, and the case remanded for a new trial. Such is the order. Costs to the defendant.

CHERRY, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.