400 P.2d 570

Phillip Roy SMITH, an infant, by Andrew J. Smith, his guardian ad litem, Plaintiff,

v.

Ignacio Theodore GALLEGOS and Wasatch Construction Company, Defendants, Third-Party Plaintiffs and Appellants,

William Jewel JONES and Milwhite Mud Sales Company, a corporation, Defendants, Third-Party Defendants and Respondents.

No. 10226.

Supreme Court of Utah.

April 8, 1965.

------◆------

Hanson & Garrett, Salt Lake City, for appellants.

Hanson & Baldwin, Salt Lake City, for respondents.

CROCKETT, Justice:

This suit arises out of a collision between two large truck units at the intersection of the arterial highways, Redwood Road and 3500 South in Salt Lake County. The truck driven by respondent, William J. Jones, hauling for Milwhite Mud Sales Company, approaching from the north, was making a left-hand turn toward the east when it was struck by a Wasatch Construction Company truck driven by Ignacio T. Gallegos which came into the intersection from the south.

This case is somewhat cluttered up because Phillip Roy Smith, a passenger in the Jones truck, sued all concerned; they responded by denying liability; attempting to shift the blame for injuring Smith to each other; and by cross-complaining against each other for their own damages. We can unclutter it by noting that the claim by Smith has been settled; Milwhite Mud Sales Company has been eliminated; and we can simplify the issues on this appeal by regarding respondent Jones as in effect a plaintiff who recovered a judgment of $9,661.46 for personal injuries and damages to his truck against Wasatch Construction Company and Gallegos as defendants.

The sole issue of consequence is raised by appellant's contention that Jones should be held contributorily negligent as a matter of law for failure to yield the right of way at the intersection as required by our statute as amended by Chapter 86, S.L.U. 1961 (designated in our Code as Sec. 41–6–73, U.C.A.1953).

Our former statute, Sec. 41–6–73, U.C.A.1953, provided that a driver within an intersection intending a left turn should yield to approaching vehicles close enough to constitute an immediate hazard at the time he commences his turn. But after having so yielded, vehicles at a greater distance were obliged to yield to him. Under the new statute, the left turner is obliged to yield to vehicles so close as to constitute an immediate hazard, "during the time when such driver is moving within the intersection." The addition of the language just quoted clearly places a greater duty on the left turner in that he must

yield not only to approaching vehicles close enough to constitute a hazard prior to beginning his turn, but also to vehicles which will constitute a hazard "during the time he is moving within the intersection," which includes the time it will be necessary for him to complete his turn.

The increased duty as imposed by this amendment must, of course, be looked upon with reason and the statute so applied as to deal with the practical exigencies encountered in moving traffic in order to achieve the greatest efficiency of movement consistent with safety. It is not reasonable to suppose that it was intended to compel a left turner to sit interminably at an intersection in fear that if he attempts to turn he will be "fair game" for anyone who could manage to strike him. Conceding the appellant's assertion that the accident itself is proof that there was a hazard, this does not necessarily prove that it was, or should have been, apparent to the plaintiff that there was a hazard of his being struck during the time he would be moving in the intersection. No one should be obliged to accept any such "a rose is a rose" type of reasoning as to permit appellant to say, "Well, I hit you, so I must have been a hazard." This would be manifestly unfair and would result in concluding that at any time a left turner got hit he must have been at fault; and this no matter how reckless or unlawful the driving of the other car might have been.

Justice does not sanction any such favoring of one party at the expense of the other. It imposes upon all drivers, including not only the left turner (respondent Jones), but also upon the oncoming vehicle (appellant Gallegos) the fundamental duty which pervades the entire law of torts and from which no one is at any time excused: to use that degree of care which a reasonable and prudent person would use under the circumstances for the safety of himself and others. Notwithstanding the onerous duty now imposed upon the left turner by this new statute, he is entitled to assume that other drivers will also be conforming to the requirements of law, by keeping within the speed limit, by keeping a proper lookout and control over their cars and by using reasonable care for the safety of themselves and others. If the left turner in performing his duty, and in making the required observation, sees no vehicle approaching, or that any coming is far enough away so that he can reasonably believe that he has time to make his turn, he may proceed.

The contentions and the evidence relied upon by the parties must be considered in the light of the principles just discussed. The collision occurred at about 8:30 in the evening of September 7, 1961. The weath-

er and the visibility were good. North of its intersection with 3500 South, Redwood Road is a four-lane highway plus a left-turn lane in the center; south of that intersection it is somewhat narrower, and there is no special left-turn lane, but left turning traffic uses the center lane. There was a semaphore light operating at the intersection and the speed limit was 40 miles per hour. As is not unusual in this type of collision, there is conflicting testimony as to just what occurred. This is not surprising when it is realized that such a collision usually happens so suddenly and unexpectedly that those involved may be hardly aware of what is happening until it is over; that they are often badly shaken up or in shock; and very naturally reconstruct the occurrence in the light of their own interests.

Mr. Gallegos states that as he approached from the south, at a speed of approximately 30 to 40 miles per hour, he was following a Pontiac car; that as he neared the intersection, the Pontiac pulled to its left into the inside, or left turning lane; that he observed the Jones unit proceeding into the intersection and making a left turn, and as it was doing so, he stepped on his brakes, sounded his horn and turned slightly to his right, but was unable to avoid the collision. However, there was other testimony that as Gallegos approached the intersection he was traveling 40 to 45 miles per hour, and

that as he entered the intersection his engine had the sound of accelerating. The manner in which his truck crashed into respondent's truck and continued northeasterly where it collided with three other vehicles on 3500 South also corroborates that it was traveling at considerable speed. The evidence further shows that Gallegos had been traveling on the inside lane coming northward, and as he approached the intersection had just pulled into the outside (his right) lane around other northbound cars. From this it will be noted that inasmuch as these other cars on the inside lane would have been between Gallegos and the oncoming Jones truck, the jury could reasonably regard this as supporting the testimony of Jones that he looked and saw no oncoming traffic that presented any hazard to him when he commenced his turn.

Mr. Jones's version was that as he approached the intersection from the north he pulled into the left-turn lane and signaled his turn; that as he was stopped at the light, he noticed cars across the intersection in their left-hand lane; that when the light turned green and the vehicles across started to turn west, "I checked and everything was clear as far as I could see"; that he then proceeded to make his left turn and "was pretty well across Redwood Road into the other road going east" when he first observed the headlights of the appellant's truck "bearing down on me," and

it was too late to do anything to avoid being struck.

It is elementary that where there is dispute in the evidence, resolving the conflicts is for the jury under its prerogative as the exclusive finder of the facts.[1] It is equally so that because of the jury's verdict in his favor, we accept the respondent Jones's version of the facts and review the evidence and all inferences fairly to be drawn therefrom in the light most favorable to him.[2] Having done so, it appears that there is a reasonable basis therein upon which the jury could remain unpersuaded that respondent Jones failed to perform his duty'[3] in yielding the right of way, as we have discussed. herein. Accordingly, the trial court was well advised in rejecting appellant's contention that respondent Jones should be held guilty of contributory negligence as a matter of law and properly presented the issues to the jury for determination.

Affirmed. Costs to respondent William J. Jones.

HENRIOD, C. J., and McDONOUGH, WADE and CALLISTER, JJ., concur.

1. See Joseph v. W. H. Groves Latter-Day Saints Hospital, 10 Utah 2d 94, 348 P.2d 935.

2. See Gordon v. Provo City, 15 Utah 2d 287, 391 P.2d 430 (1964).
3. See discussion in Stickle v. Union Pacific R.R. Co., 122 Utah 477, 251 P.2d 867, 870.