467 P.2d 610

Arthur O. NAUMAN, Plaintiff
and Respondent,

v.

HAROLD K. BEECHER & ASSOCIATES,
a Utah corporation, Defendant
and Appellant.

No. 11579.

Supreme Court of Utah.

March 24, 1970.

architect and another architect. Briefly, it alleged the defendants were under contract to supervise construction of the Salt Lake City-County Complex; that on October 17, 1963, at the construction site of the east-west utility tunnel which was part of said contract, a cave-in occurred, causing plaintiff's injuries; that said tunnel was dangerous and unsafe; that the excavation did not comply with state safety regulations; that the defendants knew of such dangerous condition for many days prior to the accident, and negligently failed to shut down the work, although defendants had the authority and duty to do so.

We held that plaintiff's complaint stated a cause of action against the defendant corporate architect.[1] After remand a trial was had to the District Court, sitting without a jury. Judgment was awarded to plaintiff. Defendant appeals.

The material facts are: Salt Lake City and Salt Lake County on March 1, 1960, entered into separate but similar contracts with defendant whereby the latter agreed to plan, design and supervise construction of the present Metropolitan Hall of Justice Complex in Salt Lake City, Utah.

The contract provided, in part, that defendant shall furnish certain architect's services, and also a qualified on-site inspector, one of whose duties was to super-

Ray, Quinney & Nebeker, Stephen B. Nebeker, Ronald C. Barker, Salt Lake City, for defendant and appellant.

Donn E. Cassity, Eugene H. Davis, Ford G. Scalley, Salt Lake City, for plaintiff and respondent.

Clyde, Mecham, & Pratt, Allan E. Mecham, VanCott, Bagley, Cornwall & McCarthy, Robert M. Anderson, Salt Lake City, amicus curiae.

SHEYA, District Judge.

This case was before this Court on a prior appeal from a dismissal of plaintiff's second amended complaint. The purpose of that appeal was to determine whether said complaint stated a cause of action against the defendant corporate

1. Nauman v. Harold K. Beecher & Associates et al., 19 Utah 2d 101, 426 P.2d 621.

vise and inspect all phases of the work being done; that the city engineer shall represent the City, and the architect shall perform all required services under his direction and supervision.

Defendant prepared specifications pursuant to said agreement, containing a general contract between the public bodies and Christiansen Brothers, Inc., the general contractor. The pertinent parts thereof are hereinafter set forth.

In Paragraph 19 of said general contract it was provided that the contractor was to comply with all Federal and State laws that in any manner affected his operation under the contract.

The "special conditions" of the specifications provided that the contractor shall take all necessary precautions for the safety of the public and employees on the work and shall comply with all applicable Federal, State and municipal safety laws and building codes to prevent accident or injury to persons on * * * the premises where the work is being performed; and required the contractor to provide and be responsible for all temporary shoring needed for executing and protecting the work.

One part of this construction project included the excavation of an east-west utility tunnel about nine hundred feet long extending from the Hall of Justice building to the old City-County building to bring heat from the new boiler room to the old building.

Defendant drew plans and specifications for the tunnel, showing the location, dimensions and the materials to be used therein. The method, means and how the excavation was to be constructed, were left to the general contractor. The excavation on the tunnel was to be commenced about September 1, 1963.

Defendant employed Johnathan H. Tucker as an on-site inspector for the entire Hall of Justice Complex, covering about eleven acres of construction work. The public bodies employed a project representative named Harry F. Butcher. Wally Christiansen was the project manager for Christiansen Brothers, the general contractor of the project. He will hereafter be referred to as "Wally" and Christiansen Brothers will be hereafter referred to as the "contractor."

Tucker and Butcher complained to Wally or to Rolf Christiansen almost constantly from the start of the excavation about lack of shoring or sloping of the walls of the tunnel and other safety violations. Tucker also complained, at defendant's request, to the Industrial Commission about the middle of September 1963, concerning said violations. In response, John Holmes, a state safety inspector, first arrived on the job to inspect it on September 16, 1963. He also inspected it on September

17, 18, and October 4, 1963. On September 16th Holmes found unsafe conditions existed near the sidewalk east of the old City-County building and not where the cave-in occurred. Holmes gave orders to the contractor to shore up and to "live up to state regulations." On September 18th, shoring was being done on the east side of the sidewalk, which appeared ample and proper. No work was being done in the tunnel on October 4th.

The trial court having found for the plaintiff upon our review we must survey the evidence in the light most favorable thereto to determine whether there is substantial evidence to support the findings; or, to state it conversely, if there is no reasonable basis in the evidence to support the findings, they cannot be sustained.[2]

The numerous complaints made to the contractor by both Tucker and Butcher, and the complaints to Mr. Holmes, all culminated in a meeting about September 25, 1963 between Beecher, representing defendant architect, Wally Christiansen, representing the contractor, Butcher and others representing the City. The then foreman for the contractor, George Knight, was apparently inexperienced in excavation work and had not been following good construction practices. The employment of a new foreman was discussed. Beecher said, "We have got to get a new foreman."

Wally approved, and also agreed to stop the work on the utility tunnel until he could obtain a competent and safe foreman, and not because of any existing unsafe conditions.

The work was thereafter shut down from about September 27, 1963 to October 16, 1963. In the meantime the plaintiff, Arthur O. Nauman, was named by the contractor as its new foreman. He had been an employee of the contractor for about ten years, (four years as a foreman), and had been in the construction industry seventeen years. Wally told plaintiff at the time the latter started work that this portion of the work had been stopped because the prior foreman had not competently and safely directed the work. Plaintiff, in testifying as to his prior experience, stated he had worked in an excavation about eighteen feet deep but mostly smaller ones; that he had worked on a number of important projects, including the University of Utah Medical Center and the Boy Scout Building, both in Salt Lake City.

The contractor notified Beecher that plaintiff was a safe and competent foreman and was to take charge of the utility tunnel. Nauman commenced work as foreman on October 16, 1963. During the two weeks that work on the excavation had been stopped, the contractor had backfilled

---

2. Memmott v. United States Fuel Co., 22 Utah 2d 356, 453 P.2d 155; Smith v. Gallegos, 16 Utah 2d 344, 400 P.2d 570.

the excavation to about one hundred feet west of Second East Street, and the excavation was being cleaned out by Evan Ashby, the dragline operator, who also sloped the banks thereof in order that plaintiff could start work on the tunnel when he came on the job.

On the morning of October 16, 1963, Wally told plaintiff there had been complaints about their work from Tucker and Butcher; that the complaints were overly exaggerated; that he could rely on shoring, and there would be no need for further tapering the banks; that he couldn't afford more tapering than had already been done; that there was a light pole on the side of the excavation which the City would not allow them to remove; that the contractor could not "taper" any more in that area; that plaintiff would have to rely on the shoring that was in that area and additional shoring if he needed it around that area. Plaintiff and Wally later went into the west end of the existing tunnel to examine the material which was there. Plaintiff was introduced to Butcher, and later had a conversation with Tucker in which plaintiff asked what Tucker considered to be the problem with the excavation, or why there had been complaints as mentioned earlier in the day to plaintiff by Wally. Tucker replied that in his opinion the walls of the tunnel could be sloped more, which would make it safer. Wally instructed Ashby to take directions from plaintiff. Wally authorized plaintiff to put in whatever shoring he felt was appropriate in the excavation and to use the material there for shoring, and, if he needed more, plaintiff could get it from the mill.

Plaintiff testified that as he understood the conditions, he considered the tunnel safe for the work they were doing immediately prior to the cave-in; that he was under the impression that he was to observe the precautions that he considered necessary for himself and the men who worked under him. The following question and answer appear in the record:

"Q. (Barker) Did you consider the conditions as they then existed to be safe for what you were doing?

"A. (Nauman) As I understood the conditions at the time, I considered it (sic) safe for the work we were doing in regards to leveling the gravel, pumping the water, taking the higher portions of soil out of the excavation with the gravel fill."

Plaintiff also stated he looked at the walls of the excavation for safety purposes on the 16th and 17th of October, 1963 briefly and to his satisfaction, and that they were safe to send workmen into the excavation for the type of work they were doing.

On the morning of October 17, 1963 at about 9:30 a. m., Mr. Nauman had set up his surveyor's level about eight feet from the existing tunnel and was taking grade shots when the cave-in occurred. He had commenced work an hour and a half before, and was at the excavation site 30 to 45 minutes before the cave-in. He received serious and permanent injuries when the south wall of the tunnel gave way and hit a wooden concrete form which he was standing behind and which in turn struck him.

The controlling issue in this case is the challenge to the trial court's findings that the trench in the area where the cave-in occurred was dangerous and unsafe; that the same did not comply with the general safety orders of the Utah Industrial Commission regarding shoring and sloping; that the architect knew or should have known the trench was unsafe, and negligently failed to stop the work.

It is apparent that said findings are based at least in part on the court's conclusion that a projection of earth near the top of the excavation alongside of the light pole (shown in a picture taken the day before the accident) must have fallen on to the wooden concrete form that pinned Nauman, and that the slough-off of earth from the south side of the excavation would not have had sufficient weight to have caused plaintiff's injuries; the court then concluded the architect was negligent in permitting the work to resume after the two week shut down between September 27 and October 16, 1963 while the dangerous condition caused by the projection of earth remained. The court's memorandum decision states in part as follows:

> * * * there is a large projection at the top of the trench which, in the opinion of the court, would have to have fallen in order to put the weight on the form that the plaintiff was standing behind at the time of the sloughing. This appears to be clearly logical in view of the large amount of dirt that was on top of the plaintiff at the time they attempted to rescue him.

We have examined the photographs which show the scene immediately after plaintiff's removal. It is evident therefrom and from other evidence that the earth projection referred to by the trial court was still standing after the accident, and therefore could not have fallen on the form that struck plaintiff. The dragline operator, Mr. Ashby, who witnessed the accident, testified the earth fell from an area about three or four feet from the top of the tunnel, which appears consistent with the photograph. Ashby estimated that one-half to one cubic yard of earth fell on the form; and that one cubic yard would be two thousand, seven hundred pounds. Even one-half of that amount (1,350 lbs.) falling on the form which struck plaintiff would have been

enough to cause plaintiff's injuries. Thus if resumption of the work with that earth projection still standing should be deemed to constitute negligence on the defendant's part, it still does not appear that that negligence was the proximate cause of the plaintiff's injuries because the earth projection did not fall.

There is the further important problem as to plaintiff's contributory negligence. He testified in his deposition of February 19, 1966, (which was published), that he considered the area around the light pole dangerous and observed the earth in that area was not sloped and was near vertical or overhanging. He had been given authority by the project manager to install whatever shoring he considered appropriate. Although he told Tucker that said area was a hazard, he was aware of the condition existing around the light pole but took no steps to make the work safer, because he considered the excavation safe for the work they were doing. Otherwise, he could have made it safer before proceeding with the work, since as foreman he had authority to shore as much as necessary to make the excavation safe. There is no showing that he was compelled to proceed with the work until this was done. In view of Wally's explanation to plaintiff of the problems with the excavation and Tucker's advice concerning the hazard around the light pole and that further sloping of the walls would make them safer, in addition to plaintiff's own observations, plaintiff was fully aware of the condition of the walls prior to the cave-in, and plaintiff's arguments that he was inexperienced with such excavations and that he was on the job only nine and one-half hours prior to the accident do not relieve him of his responsibility under the circumstances.

■ We turn attention to the question whether there was violation of duty on the part of the architect. The immediate cause of plaintiff's injury was the unsupported form which the cave-in knocked against him. The evidence does not show that anyone considered the mere presence of the form as it existed to be unsafe before the cave-in. But the important fact is that, whether the form should have been braced or removed was a matter of construction method or practice with which the architect had no right or duty to interfere. As we stated when this case was before us on appeal the first time,

> The method of construction was a matter solely under the control of the contractor, and the defendant (architect) had no right to interfere with the contractor's execution of the work, *  *3

■ It would be outside the bounds of reasonable care to require the architect

3. Nauman v. Beecher, supra.

to scrutinize each act done by the foreman and fifty-eight other workmen over an eleven acre construction site to make certain that none of them did a potentially dangerous act.

To support the trial court's findings and judgment, there must be competent and substantial evidence that a condition existed which a reasonably prudent architect practicing in the locality would have regarded as dangerous and thus justify the requiring of closing down the excavation work prior to the cave-in.

A Michigan court has held:

* * * (T)he responsibility of an architect does not differ from that of a lawyer or physician. When he possesses the requisite skill and knowledge, and in the exercise thereof has used his best judgment, he has done all the law requires. The architect is not a warrantor of his plans and specifications. The result may show a mistake or defect, although he may have exercised the reasonable skill required.[4]

This Court has held that a doctor was not required to guarantee his treatment, and further:

The law does not impose upon a physician or surgeon the duty of guaranteeing that his treatment will achieve good results, but on the contrary, the law imposes upon him the duty to employ that care and skill required of men of similar calling, and under similar circumstances.[5]

In a suit against an architect, plaintiff's allegations and proof must show (1) the architect failed to meet the standard of his profession in preparing plans or supervising the work, or (2) that failure to supervise the work properly in accordance with the terms of his contract resulted in injury.

The liability of architects is based upon professional negligence with respect to which only those qualified in the field can testify as to the standard of competence and care possessed by professional men in the locality and whether there has been a breach of that standard of care.[6]

The California District Court of Appeals, First District, approved an instruction given by the trial court which stated in part: * * * in determining whether the defendants architects' learning, skill and

4. Bayne v. Everham, 197 Mich. 181, 163 N.W. 1002, 1008 (1917).

5. Dickinson v. Mason, 18 Utah 2d 383, 423 P.2d 663 (1967). See also Marsh v. Pemberton, 10 Utah 2d 40, 347 P.2d 1108; Edwards v. Clark, 96 Utah 121, 83 P.2d 1021, 1029, 1030; Baker v. Wycoff, 95 Utah 199, 79 P.2d 77; Baxter v. Snow, 78 Utah 217, 2 P.2d 257; Anderson v. Nixon, 104 Utah 262, 139 P.2d 216.

6. Covil v. Robert & Co. Associates, 112 Ga.App. 163, 144 S.E.2d 450 (1965).

conduct fulfilled the duties imposed by law, as they have been stated to you, you are not permitted to set up arbitrarily a standard of your own. The standard is that set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in the same locality, at the same time.[7]

Plaintiff relies on Paragraph 12a in the contract between the owners and contractor which provides:

If, in the judgment of the architect and/or the city engineer or county engineer, it is necessary to close down the work due to * * * circumtances arising during the progress of the work, that may be construed to be dangerous * * * the Contractor shall comply and he shall stop all operations * * * until further orders in writing are given. * * *

Assuming this provision applies to the defendant, even though it was not a party to said contract, and did not sign it, whether or not the architect exercised proper or reasonable judgment, would have to be based upon the testimony of other architects and not upon the testimony of lay persons. Yet, the plaintiff did not produce any architect as a witness.

█ Of course, if the condition of this excavation was so obviously dangerous and unsafe immediately prior to the cave-in that any person could recognize the danger, then the trial court could have relied on testimony from lay persons, if sufficient, upon which to base its findings.[8] However, nearly all the men working on the job, including the plaintiff himself, and an on-site inspector testified that they thought the excavation was safe immediately prior to the accident for the work they were doing. The operator of the dragline, Evan Ashby, testified likewise. Jonathan H. Tucker, when asked if he told Nauman about the loose dirt he saw under the lamp pole, testified that he (Tucker) considered that where plaintiff was, it was perfectly safe; that plaintiff was at the end of the concrete that had already been poured. Wally, the project manager, testified as to the safety of the excavation. Likewise four licensed architects, Ruben, Montmorency, Edwards and Beecher, defendant's president, all testified that the excavation appeared safe. Ruben testified that the south bank, where the cave-in happened, was sloped eleven feet. Since the depth of the excavation was about twenty-two feet, the sloping complied with the Industrial Commission's safety requirement. Montmorency stated that in his opinion the excavation did not constitute a dangerous condition and was safe. Edwards' testimony was that the sloping

7. Paxton v. Alameda County, 119 Cal.App. 2d 393, 259 P.2d 934 (1953).

8. James v. Robertson, 39 Utah 414, 117 P. 1068.

met Industrial Commission requirements. Beecher testified that observing the excavation immediately prior to the accident it appeared to be safe and he would not have shut down the work.

It is true that Harry F. Butcher, project engineer for the City, testified the walls of the tunnel were straight up and down except where it had been sloped a little at the top. However, on cross examination, Butcher conceded that the south bank (where the cave-in occurred) had been sloped back as much as ten feet. This practically meets the Industrial Commission requirements.[9] Butcher also testified that although he was at the excavation before and after the accident on October 17 with Tucker, he didn't see where the dirt had fallen from.

Casper A. Nelsen of the Industrial Commission testified that the walls of the excavation were "real vertical—rather irregular as one may expect with a dragline excavation." Mr. Nelsen, however, admitted on cross examination that the walls had been sloped about ten or eleven feet on both sides. This would comply substantially, if not fully, with Industrial Commission requirements.

John Holmes, safety inspector for the Industrial Commission, did not give testimony concerning the condition of the excavation on the morning of October 17, 1963.

An eye witness to the cave-in, John L. Ulibarri, was working just ten feet away from the area where and when the cave-in took place. He testified the walls were straight up and down on the south side; that the walls of the banks looked dangerous to him. He was not a qualified expert; and he had made no protest, nor called to anyone's attention the condition of the walls. It is difficult to understand why he was working in this excavation if it appeared dangerous to him, since he should have been concerned for his own safety. Under those circumstances, his testimony, when considered in connection with all of the evidence in the case, could not properly be regarded as substantial evidence that the condition of the tunnel was so dangerous that the architect should have known and acted upon it.

■ It is the opinion of this court that there is not sufficient believable, competent substantial evidence to support the trial court's finding and judgment, particularly because the evidence shows that plaintiff was not only warned of conditions existing in the trench before the accident, but that he personally examined the walls of the excavation and concluded they were safe for the work they were doing; and that it was his prerogative and

---

9. i. e., one foot of slope to each 2 feet of depth.

duty as foreman to have any dangerous condition remedied. In view of those facts, and the other abundant credible evidence that the walls appeared to be safe, it seems entirely unreasonable to place the responsibility upon the defendant architect to have known that the walls were unsafe and suspended work on the job. On the basis of what we have said herein it is our opinion that it cannot fairly be said that there is substantial evidence in the record to support a conclusion that the architect so breached his duty in that regard, nor that his conduct fell below the standard of care generally observed by architects in the locality. In the absence of any competent proof to support such a conclusion it is necessary that the judgment of the trial court be reversed. No costs are awarded.

CALLISTER and HENRIOD, JJ., concur.

ELLETT, Justice (concurring in the result).

I concur in the result and in connection therewith wish to state that in my opinion an architect has no duty with reference to the manner in which the contractor performs his work. The architect represents the owner, and his duty is to see that the construction is in accordance with the plans and specifications and is safe for the use for which it is intended. He has no right to shut down a job because he may think there is a better way to dig a ditch or to shingle a roof than that chosen by the contractor. The Industrial Commission has an interest in laborers and a duty to see that they have a safe place to work,[1] but that is not a function of an architect.

TUCKETT, J., dissents.

CROCKETT, C. J., having disqualified himself, does not participate herein.